KAISER HAWAII KAI DEVELOPMENT CO., A NE-
VADA CORPORATION *v.* EDWIN P. MURRAY,
FRANK E. MIDKIFF, ATHERTON RICHARDS,
RICHARD LYMAN, JR. AND HERBERT K. KEP-
PELER, TRUSTEES UNDER THE WILL AND OF
THE ESTATE OF BERNICE P. BISHOP, DE-
CEASED.

No. 4444.

APRIL 12, 1966.

CASSIDY*, WIRTZ, LEWIS AND MIZUHA, JJ., AND
CIRCUIT JUDGE FAIRBANKS ASSIGNED BY
REASON OF VACANCY.

OPINION OF THE COURT BY LEWIS, J.

By submission pursuant to R.L.H. 1955, c. 227, the
parties have presented for determination a question aris-
ing under an agreement dated April 27, 1961, between the
trustees of the Estate of Bernice P. Bishop, hereinafter
referred to as "Bishop," and Kaiser Hawaii Kai Develop-
ment Co., hereinafter referred to as "Hawaii Kai."

---

* Acting chief justice when this case was submitted.

The agreement is appended to and made a part of the submission. It provides that Hawaii Kai is to develop, improve and subdivide lands owned by Bishop for leasing, and Bishop is to execute leases of the subdivided lands as lessor, receive the rents and other charges collected under the leases, and pay them out making certain payments to itself as well as others, the balance to go to Hawaii Kai for a stated period. The question in difference is when, and under what conditions, Bishop is entitled to reimburse itself for certain real property taxes it has paid on a tract of land known as "Koko Kai Unit 1," subdivided, developed and improved by Hawaii Kai pursuant to the agreement. This tract, according to the submission, typifies a number of tracts involving the same question.

The parties are agreed that Bishop's right of reimbursement for real property taxes is (1) confined to real property taxes on improved land that is ready for leasing but not leased, and (2) commences as of January 1 following the completion of a tract ready for leasing provided that at least six months[1] shall have intervened. In this case January 1, 1962 is the applicable date, according to the submission. The tract, Koko Kai Unit 1, was ready for leasing in June 1961. It consists of 109 residential lots and a pump station.

As each lot is leased, the lease provides that the lessee shall pay the real property taxes on the demised premises, and provides as well for the proration of accrued taxes between the lessee and Bishop as of the commencement of the lease. No question is presented as to taxes for which lessees are responsible.

---

[1] The six months' period applies to residential property. For apartment, commercial and hotel lots it is twelve months. The exact provisions appear in the Appendix to this opinion as Section C-1(a) and C-1(b).

The submission shows that as of June 30, 1963, 104 of the 109 residential lots in Koko Kai Unit 1 still were not leased, and Bishop had paid real property taxes with respect to these 104 unleased lots in the sum of $57,033.42 from and after January 1, 1962. For the same period, up to the date of leasing of each of the five leased lots, Bishop had paid real property taxes on these five lots in the sums of $137.41, $64.73, $257.01, $104.23, and $106.10, respectively, a total of $669.48. By June 30, 1963, Bishop had received as rent for the five leased lots the sums of $1,300, $1,333.33, $666.68, $2,000, and $2,000, respectively, a total of $7,300.01. Thus, the rents on these five lots totaled $6,630.53 over and above the aforesaid taxes on the same lots. The reimbursement of the taxes on these five lots is not in controversy.

The controversy concerns the reimbursement of the $57,033.42 of taxes on the unleased lots. Bishop contends "that it may reimburse itself the entire amount out of any monies received by it with respect to any lots anywhere leased pursuant to The Agreement to anyone other than Hawaii Kai or an organization controlling or controlled by Hawaii Kai." Hawaii Kai contends "that Bishop cannot recoup property taxes respecting any lot until a lease thereof has been made, and then it is only entitled to be reimbursed for real property taxes paid with respect to the lot in question for the period January 1, 1962 until the date of the lease out of rentals received for the lot in question." Thus, under Bishop's position, it may have recourse to the above sum of $6,630.53 as well as other rents received under the agreement as a means of reimbursement of the real property taxes on the 104 lots not leased, while under Hawaii Kai's position this sum of $6,630.53 may not be so applied, and Bishop must look to the rents of each of the 104 lots, as each lot is leased, for reimbursement of the taxes paid on that lot prior to the

date of the lease. We are of the opinion that Hawaii Kai's position is correct.

We have set out, in the Appendix, Article C of the agreement and a portion of Article F, that is, Section F-8. We deem these parts of the agreement determinative. Article C provides in the first paragraph of Section C-1, which is unnumbered, that Bishop shall "out of its own funds" pay all real property taxes assessed against the lands which are the subject matter of the agreement[2] "not paid by lessees."[3] Then follows the provision that the tax payments thus made by Bishop "shall not be treated as paid out pursuant to the provisions of Section F-8(a) hereof." These provisions in turn are "subject to the following limitations," referring to paragraphs (a), (b) and (c) of Section C-1. To appreciate the significance of the foregoing it is necessary to refer first to Section F-8.

Section F-8 provides that the monies received by Bishop "with respect to one or more Lots covered by any lease or leases thereof" shall be "accounted for" and "paid out" in accordance with three paragraphs, designated (a), (b) and (c). Since the balance of the monies received, after the payments provided for by paragraphs (a) and (b) of Section F-8, goes to Hawaii Kai for a thirty-year period pursuant to paragraph (c), and since only paragraph (a) of Section F-8 speaks of taxes, it is seen that the statement in the unnumbered first paragraph of Section C-1 that the tax payments made by Bishop shall be "out of its own funds" and "shall not be treated as paid out pursuant to the provisions of Section F-8(a) hereof"

---

[2] The paragraph speaks of taxes assessed against "The Land." That term is defined by Section A-1 to mean the lands which are the subject matter of the agreement, comprising 6,000 acres, more or less.

[3] Section C-1 further provides that when each lot is leased, the lease shall provide for the proration of accrued taxes as of the commencement of the lease.

is a general statement that Bishop has no right of reimbursement for these tax payments. The added provision of this paragraph, "* * * subject to the following limitations," makes this general statement subject to paragraphs (a), (b) and (c) of Section C-1, which set out the exceptions to the general statement.

Turning now to paragraphs (a), (b) and (c) of Section C-1, we note that paragraph (a) relates to apartment, hotel and commercial lots, while paragraph (b) relates to residential lots. Paragraph (b) provides that "respecting each Residential Lot" the first January 1 following a date which is six months after the completion of "the Tract in which said Lot is located," shall constitute the "tax accumulation date." We shall have occasion to comment later on the terminology "tax accumulation date." The important point now is that, under the terms of the agreement, each lot has its own tax accumulation date. Though the several lots in a given tract necessarily will bear the same tax accumulation date, care was taken to state that the designated date should constitute the tax accumulation date "respecting each * * * Lot."

Paragraph (c) of Section C-1 provides that "on all Lots described in subdivisions (a) and (b)," not leased by the applicable tax accumulation date, Bishop shall continue to pay the taxes, and "as to all such taxes paid or payable by Bishop for the period between the tax accumulation date and the date the Lot in question is leased, Bishop shall be entitled to reimbursement for such taxes with respect to the Lot in question under the provisions of Section F-8(a)." Thus paragraphs (b) and (c) constitute a clear statement that the right of reimbursement exists only with respect to a particular lot for the taxes on that lot between the tax accumulation date and the date of leasing. And, as seen, the right of reimbursement does not exist at all except as set out in these paragraphs

(or paragraph (a) with respect to apartment, hotel, and commercial lots).[4]

Bishop relies on the words "on all Lots described in subdivisions (a) and (b) not leased," which appear at the beginning of paragraph (c) of Section C-1. However, these words have reference to the obligation of Bishop to pay the taxes. They do not have reference to Bishop's right of reimbursement.

Section F-8(a) is given major emphasis by Bishop, which argues that this part of the agreement provides the time and manner of reimbursement while Section C-1 covers the right to reimbursement. This argument assumes that Section C-1 is a broad provision giving a general right of reimbursement without specifying the asset or source of funds against which that right exists. Section C-1 cannot be so construed. We proceed to examination of Section F-8(a). It reads:

"(a) Real property taxes, public improvement assessments, sewer charges (public and private) and other similar charges, if any, against the Lot or Lots in question, and the taxes referred to in Section C-1(c), shall be paid to the public authority or other party entitled thereto before delinquent, and in any event the amounts collected from lessees or others during each fiscal year by BISHOP for any of the foregoing expenses shall be paid out by BISHOP prior to the expiration of such fiscal year of BISHOP."

---

[4] It is suggested that the words "Lot in question" merely identify the particular lot on which taxes are to be "paid or payable" by Bishop. Even if the words "Lot in question" as used the first time in Section C-1(c) could be so explained, they could not be explained in that way when used the second time in that section, in the phrase indicated by the emphasis added below:

"* * * as to all such taxes paid or payable by BISHOP for the period between the tax accumulation date and the date the Lot in question is leased, BISHOP shall be entitled to reimbursement for such taxes *with respect to the Lot in question* under the provisions of Section F-8(a)."

Bishop argues that when the words "real property taxes * * * against the Lot or Lots in question," are considered with the phrase "the taxes referred to in Section C-1(c)," it appears that the latter phrase is so placed as not to be modified by the words "against the Lot or Lots in question." As shown by paragraph (c) of Section C-1, which is referred to, the taxes in question are "taxes paid or payable by Bishop for the period between the tax accumulation date and the date the Lot in question is leased," for which Bishop is "entitled to reimbursement * * * with respect to the Lot in question under the provisions of Section F-8(a)." No escape from the confining words "the Lot in question" is to be found in the generality of the reference to Section C-1(c) made in Section F-8(a), since the reference to Section C-1(c) imports its own limitation.

Bishop's argument encounters still another difficulty. On a literal reading, Section F-8(a) merely provides for payment of taxes *to the public authority before delinquent* out of monies received by Bishop. So read it would include only taxes for which the lessee of the lot in question is responsible, and taxes payable by Bishop on the next tax installment date but not yet paid. It is to be noted that Section C-1(c) speaks of taxes "paid or payable by Bishop." The word "payable" refers to the portion of the accrued taxes on a particular lot payable by Bishop on the next tax installment date after prorating of the taxes between Bishop and the lessee of the lot in question, so as to permit this portion of the taxes to be paid out of monies received with respect to this lot, upon the accounting under Section F-8(a). Were we to accept Bishop's view, however, the word "payable" would be deemed to refer to any and all reimbursable taxes payable by Bishop on the next tax installment date, to the extent of the available monies received with respect to any and all lots.

But even with that liberal reading, which ignores the confining words "the Lot in question" in Section C-1(c), the section relied upon by Bishop, Section F-8(a), would fall short of covering Bishop's right of reimbursement— it would not cover taxes already paid by Bishop, to keep taxes current when rents were not available.[5] Reimbursement for taxes paid by Bishop out of its own funds to keep taxes current when rents were not available could not be deemed payment "to the public authority or other party entitled thereto before delinquent."

No argument has been made, and in our view the agreement as a whole would not support the argument, that taxes paid by Bishop out of its own funds to keep taxes current when rents were not available were to be treated in one way, i.e., with reimbursement on a lot-by-lot basis as would necessarily follow since the language of Section F-8(a) would be inapplicable and only the language of Section C-1(c) would be applicable while taxes would be treated in another way, i.e., with recourse against all of

---

[5] The submission shows: "As of June 30, 1963, BISHOP had paid $110,109.10 real property taxes on lots subject to The Agreement after their respective tax accumulation dates, and had received $82,487.50 in rents from lessees under The Agreement * * *." Thus, to keep taxes paid up, Bishop necessarily has continued to pay some taxes out of its own funds, whether or not all the rents could be tapped for real property tax payments.

The submission does not show the extent of the payments necessarily made out of Bishop's own funds, because it does not show when the $82,487.50 in rents was received. It is noteworthy that, under Section F-8(c), the balance which Hawaii Kai is to receive "shall be accounted for by BISHOP and paid to HAWAII KAI within fifteen (15) days after the end of the month in which such payments are received by BISHOP." The submission does not show what part of the $82,487.50 in rents was in hand when the taxes became payable. Hence it does not show what part of the $110,109.10 in taxes could have been paid, before delinquent, out of rents in hand if all the rents were available for that purpose, nor does it show the amount of taxes that necessarily had to be paid out of Bishop's own funds to keep taxes current even if all the rents could be tapped for taxes. If we confine our attention to the one tract as to which the most complete information is furnished by the submission, Koko Kai Unit 1, the submission shows that Bishop, even if all the rents from that tract could be tapped for taxes, necessarily has paid out of its own funds about 80% of the $57,033.42 in controversy.

the rents, to the extent rents were in hand sufficient in amount to cover the taxes "before delinquent" as provided in Section F-8(c).

It is evident that, on a literal reading, Section F-8(a) does not support Bishop's case. But the submission does not seem to call for a literal reading of Section F-8(a). It seems to call on us to read the words "the taxes referred to in Section C-1(c)" apart from the words "shall be paid to the public authority or other party entitled thereto before delinquent."[6] If that is done the provision last quoted merely relates to charges the lessee is to pay. The words "the taxes referred to in Section C-1(c)," which relate to a different subject matter, are not to be read with the provision for payment to the public authority or other party entitled thereto before delinquency. However, if this reading is accepted, it must likewise be accepted that the words "the taxes referred to in Section C-1(c)" are wrongly placed in the paragraph, and Bishop's argument again is defeated. On either a literal reading or the one last considered it appears that Section F-8(a) is incomplete and dependent on other provisions for its interpretation. We conclude that Section F-8(a) has a limited function with respect to the matter before us, that of supplying the information that tax reimbursement under Section C-1(c) has precedence over the payments provided

---

[6] Paragraph I of the submission makes the agreement a part thereof. Paragraph II quotes the first portion of Section F-8(a), ending with the words "the taxes referred to in Section C-1(c)" followed by a series of dots indicating omissions. Paragraph III states:

"The controversy herein submitted to this Court relates to the meaning of the phrase 'the taxes referred to in Section C-1(c)' as used in the portion of subsection (a), Section F-8 of The Agreement above quoted * * *."

Thus the submission informs us as to the whole of Section F-8(a) and at the same time asks us to interpret the phrase "the taxes referred to in Section C-1(c)" as used in the first portion thereof. This seems to call on us to read the quoted words apart from the words which follow. At the same time we must take cognizance of the whole of Section F-8(a).

for by Sections F-8(b) and F-8(c). Section C-1 contains all of the elements of the right of tax reimbursement, although the priority of that right is supplied only by reference, that is, by the reference in Section C-1(c) to Section F-8(a).

It will be noted, upon reference to the Appendix, that Section F-8(b) gives the second priority to Bishop's "Basic Rental."[7] Other portions of the agreement show that the basic rental is a percentage of the annual rental paid by the lessee. The basic rental is to be retained by Bishop "with respect to the Lot or Lots in question."

Finally, as provided by Section F-8(c), the "balance of all payments received" goes to Hawaii Kai for the thirty-year period there stated, that is, thirty years of lease payments. In case of a considerable accumulation of items reimbursable to Bishop,[8] Hawaii Kai would not invariably come into a "balance" payable to it under Section F-8(c) immediately upon the commencement of lease payments. Hawaii Kai would lose part of its thirty-year period as to some or all of the lots. And of course any delay in leasing, if continued at all beyond the tax accumulation date, would reduce the balance payable to Hawaii Kai on any theory of the case.

In addition to annual rental a "Lot Development Payment" was to be paid by each lessee. It is implied by

---

[7] According to Bishop's argument, all the rents of the leased lots may be siphoned off for payment of taxes on unleased lots that have passed their respective tax accumulation dates, and the basic rentals will accumulate awaiting payment. On Hawaii Kai's theory, the problem of accumulation of basic rentals will arise in case of a considerable delay in leasing a particular lot with a consequent tax accumulation against the lot so large as to preclude, for a time, payment of the basic rental. We make no decision as to Bishop's right to accumulate charges for basic rentals, since that matter is not before us.

[8] This could occur, on Bishop's theory, if there were a great many developed lots unleased for long periods with a consequent accumulation of basic rentals in sizeable amounts (see note 7), added to the tax problem. It could occur, on Hawaii Kai's theory, as to any lot unleased for a long time.

Bishop that these lot development payments, which Hawaii Kai had the exclusive right to fix and to receive from the lessees for its sole benefit, may have been fixed too high by Hawaii Kai, and that rapid leasing may have been deterred thereby. We cannot assume any such fact. The submission contains no statement that the lot development payments were so high as to deter leasing or that Bishop made any objection to them. It was provided in the agreement that the amount of the lot development payment "shall not prevent the leasing of Lots in an orderly course * * *."

That Hawaii Kai was to receive from each lessee a lot development payment which it itself fixed may be considered as one facet of the agreement. The stated intent was that Hawaii Kai "recover solely out of Lot Development Payments and rental proceeds * * * its costs, plus a profit for its effort and risk." The rent was fixed by Hawaii Kai and Bishop by mutual agreement. As seen, Bishop was to receive a percentage as basic rental under Section F-8(b), before Hawaii Kai received anything, other than the lot development payment. The rent was fixed first, and the lot development payment thereafter. It was not to the interest of Hawaii Kai to fix the lot development payment so high as to deter leasing, and as seen the agreement expressly provided that it should not do so.

We are satisfied that it was not contemplated that there would be a great many developed lots unleased for long periods. The agreement required Hawaii Kai to "diligently pursue a development program to meet substantially the market demands," while at the same time recognizing that "economic and other factors may delay and frustrate development within such period [the initial ten-year period of the agreement]." Hawaii Kai was to be diligent, but was not required to throw caution to the

winds. It specifically was provided that Hawaii Kai was not required to proceed with a new tract development "at any time while there are 50 or more Residential Lots in each of two or more Tracts having Lots of different size or character which have remained unleased for a period of 90 days or more."

However, *some* delay in leasing was contemplated. Otherwise the parties would not have deferred Bishop's right of tax reimbursement for at least six months, in the case of a residential lot ready for leasing, or at least one year, in the case of an apartment, hotel, or commercial lot ready for leasing. After the specified lapse of time and as of the first January 1 thereafter, the taxes were to accumulate. The date when the right of reimbursement was to begin was denominated the "tax accumulation date." According to Bishop's argument it should have been designated the "tax reimbursement date." Use of the terminology "tax accumulation date"[9] manifested the understanding of the parties that from and after the specified date the taxes would accumulate. And this in turn signified a lot-by-lot basis. Taxes on unleased lots would not accumulate if all the rents from all leased lots wherever situated provided a means of payment, unless, of course, there was a great oversupply of developed lots, but this as we have seen was not contemplated.

Bishop argues that under the terms of the agreement Hawaii Kai bore all the risks of the development, including the increased taxes incident to the development of the lands, after passage of the six months' or one year's interval. The agreement stated, without exception, that the purpose was to enable Bishop to receive rental income from undeveloped and relatively unproductive lands

---

[9] The parties' use of this terminology may be viewed as an interpretation of the agreement by the parties themselves. *Cf., In re Taxes, Aiea Dairy, Ltd.*, 46 Haw. 292, 299, 380 P.2d 156, 160.

"without incurring indebtedness of any kind * * *." But since the taxes for the six months' or one year's interval before the tax accumulation date was reached were to be borne by Bishop without reimbursement—as to which there is no question—it is evident that the term "indebtedness" did not include them. This shows that real property taxes were not included in the term "indebtedness" as used in the portion of the agreement providing against the incurring of indebtedness of any kind.

Moreover, there is no room in the agreement for a distinction between the taxes on the raw land and the taxes incident to the development of the land. When Bishop argues, as it does, that "Hawaii Kai is responsible after the tax accumulation date" it is talking about all the taxes, and is arguing that Hawaii Kai, in effect, assumed the duties of a lessee with respect to the taxes on the tax accumulation date. If this were intended it could very easily have been said. And since it was not said it cannot now be supplied in contravention of the express provisions of Section C-1(c).

Hawaii Kai did not lease the land from Bishop,[10] and does not sublease the land after the lots are developed. As tenants are found Bishop becomes the lessor. Hawaii Kai has the duty of diligence in obtaining lessees for Bishop, at rents mutually agreed upon in advance, that is, prior to Hawaii Kai's proceeding with the projected development. Bishop has not relinquished control over the lands. It has retained rights in respect of matters which have to be approved by it, or as to which mutual agreement has to be reached. We shall not undertake to define the exact nature of these rights. Enough has been said to

---

10 This is the situation before us under the submission. Under the terms of the agreement Hawaii Kai may lease lots from Bishop, but in that event Bishop does not account for the monies it receives.

indicate the nature of the relationship between the parties.[11]

Bishop characterizes Hawaii Kai as the "entrepreneur," and argues that: "The obvious cause of this dispute is Hawaii Kai's failure to market lots as fast as it readies them for leasing. Under the agreement it had control of the development and assumed the risk of the venture." Hawaii Kai, according to Bishop, "overdeveloped the market."

If we accept the statement that Hawaii Kai was the entrepreneur, it does not follow therefrom that Hawaii Kai guaranteed that it was infallible. A system of checks and balances was devised under which it was not to Hawaii Kai's interest to develop the lands too rapidly, but was to its interest to prosecute the program diligently. Bishop desired and required the latter, and we do not find in the agreement any absolute protection against what, by hindsight, may appear to have been overactivity.

The function of this court is to ascertain the intention of the parties as manifested by their agreement. Restatement, *Contracts*, § 226, Comment *b*. "Their unexpressed intention is immaterial * * *." *George M. Brewster & Son* v. *Catalytic Constr. Co.*, 17 N.J. 20, 28, 109 A.2d 805, 809.

The agreement must be construed as a whole. *Territory* v. *Arneson*, 44 Haw. 343, 348, 354 P.2d 981, 985; *Hawaiian Pineapple Co.* v. *Saito*, 24 Haw. 787, 797; *Tsunoda* v. *Young Sun Kow*, 23 Haw. 660, 664. And in case of inconsistency between general and specific provisions, the

---

[11] The agreement provides that it "shall not be construed as creating the relationship of principal and agent between BISHOP and HAWAII KAI, nor as creating a partnership, joint venture, or association of any kind between BISHOP and HAWAII KAI, it being the purpose and intent hereof to create only a contract relationship between BISHOP as landowner and HAWAII KAI as an independent contractor to subdivide, develop and improve The Land."

specific controls the general. *Thompson* v. *Halawa Sugar Co.,* 6 Haw. 464, 482 (decision of single justice) ; 3 Corbin, *Contracts,* § 547, at 176-77; 4 Williston, *Contracts,* § 619, at 743-44 (3d ed.) ; Restatement, *Contracts,* § 236(c).

In this case Section C-1 is, throughout, so definite and specific as to control the whole. The contract is not susceptible of two constructions.[12] There is no room to speculate as to what might be considered equitable if the contract were being made anew. Hawaii Kai was justified in reading the contract as providing for accounting for rents on a lot-by-lot basis, even if this did not afford reimbursement of taxes immediately, or for some time after the tax accumulation date. The right of reimbursement for taxes was not given to Bishop without regard to the asset or source of funds from which the reimbursement was to come. Such right was limited to the lot upon which the taxes accrued and the monies received with respect thereto.

Accordingly, judgment will be entered declaring that Bishop has no right to reimburse itself for the taxes paid in the sum of $57,033.42 on 104 unleased lots in Koko Kai Unit 1 from January 1, 1962 through June 30, 1963, from monies received with respect to other lots, and containing such other provisions as may be appropriate.

*Ernest C. Moore, Jr. (Moore, Silberman & Schulze* of counsel) for plaintiff.

*J. Garner Anthony (Robertson, Castle & Anthony* of counsel) for defendants.

---

12 The contract not being susceptible of two constructions, the "rule of reasonableness of construction" is inapplicable. According to this rule, as stated in *Hawaiian Pineapple Co.* v. *Saito, supra,* 24 Haw. at 799, "where the language of the contract is contradictory, obscure or ambiguous, or where its meaning is doubtful *so that it is susceptible of two constructions,* * * * the interpretation which makes it a rational and probable agreement must be preferred." (Emphasis added.)

EXCERPTS FROM
AGREEMENT OF APRIL 27, 1961 BETWEEN KAISER HAWAII KAI DEVELOPMENT CO. AND TRUSTEES OF THE ESTATE OF BERNICE P. BISHOP.

*"ARTICLE C. REAL PROPERTY TAXES.*

"*Section C-1.* BISHOP shall out of its own funds pay all real property taxes assessed against The Land not paid by lessees, which payment shall not be treated as paid out pursuant to the provisions of Section F-8(a) hereof. When each Lot is leased as contemplated hereunder, such lease shall provide for the proration of accrued taxes between the lessee and BISHOP as of the commencement of such lease. The above provisions are subject to the following limitations:

"(a) Respecting each Apartment, Hotel and Commercial Lot, the first January 1 following a date which is 12 months after the subdivision, development and improvement of the Tract in which said Lot is located have been completed and said Tract is ready for leasing shall constitute the 'tax accumulation date';

"(b) Respecting each Residential Lot, the first January 1 following a date which is 6 months after the subdivision, development and improvement of the Tract in which said Lot is located have been completed and said Tract is ready for leasing shall constitute the 'tax accumulation date'; and

"(c) On all Lots described in subdivisions (a) and (b) not leased by the tax accumulation date applicable thereto, BISHOP shall continue to pay real property taxes and, as to all such taxes paid or payable by BISHOP for the period between the tax accumulation date and the date the Lot in question is leased. BISHOP shall be entitled to reimbursement for such taxes with respect to the Lot

in question under the provisions of Section F-8(a)."

\*   \*   \*   \*   \*

*"ARTICLE F. LEASING OF LOTS — PROCEEDS FROM LEASES.*

\*   \*   \*   \*   \*

*"Section F-8.* All monies received by BISHOP with respect to any Lot or Lots leased to HAWAII KAI or organizations controlling it or controlled by it shall be retained by BISHOP. All monies received by BISHOP with respect to one or more Lots covered by any lease or leases thereof made pursuant hereto with parties other than HAWAII KAI or organizations controlling it or controlled by it shall be accounted for by BISHOP in accordance with good accounting practice and shall be paid out in the following order:

"(a) Real property taxes, public improvement assessments, sewer charges (public and private) and other similar charges, if any, against the Lot or Lots in question, and the taxes referred to in Section C-1(c), shall be paid to the public authority or other party entitled thereto before delinquent, and in any event the amounts collected from lessees or others during each fiscal year by BISHOP for any of the foregoing expenses shall be paid out by BISHOP prior to the expiration of such fiscal year of BISHOP.

"(b) An amount sufficient to cover the Basic Rental with respect to the Lot or Lots in question shall be retained by BISHOP, or in the event that percentage or other formula rent paid under a lease for any given year exceeds Fixed Annual Rental payable under such lease for said year BISHOP shall be entitled to retain in lieu of Basic Rental the same proportion of such percentage or other formula rental for such year as Basic Rental bears to Fixed Annual

Rental respecting the Lot or Lots in question, as disclosed by the applicable approved schedule prepared under Section F-1.

"(c) The balance of all payments received by BISHOP for the leasing of the Lot or Lots in question shall for a total period of thirty (30) years of such payments be deemed to be collected for the account and benefit, and as the exclusive property of, HAWAII KAI, and after deducting therefrom any general excise tax required to be paid thereon by BISHOP or any other tax imposed by law by reason of the receipt thereof by BISHOP, shall be accounted for by BISHOP and paid to HAWAII KAI within fifteen (15) days after the end of the month in which such payments are received by BISHOP. After HAWAII KAI shall have received such payments for a total period of thirty (30) years, HAWAII KAI shall have no further right to or interest in any amounts received by BISHOP with respect to the Lot or Lots in question. Anything contained herein to the contrary notwithstanding, the portion of said payments in each of BISHOP'S fiscal years payable to HAWAII KAI hereunder shall be paid to HAWAII KAI before the expiration of such fiscal year."

---

DISSENTING OPINION BY MIZUHA, J.

I respectfully dissent. The controversy, according to the submission, "relates to the meaning of the phrase 'the taxes referred to in Section C-1(c)' as used in the portion of subsection (a), Section F-8 of The Agreement * * *." But Section C-1(c) actually involves two types of taxes, taxes "paid" by Bishop and taxes "payable" by Bishop. The parties state in their submission that the "question

in difference * * * is when, and under what conditions, BISHOP is entitled to reimburse itself for the $57,033.42 taxes paid by it on Koko Kai Unit 1 from January 1, 1962 (the 'tax accumulation date') through June 30, 1963, inclusive."

Bishop contends that "it may reimburse itself the entire amount out of any monies received by it with respect to any lots anywhere leased pursuant to The Agreement * * *." Hawaii Kai contends "that BISHOP cannot recoup property taxes respecting any lot until a lease thereof has been made, and then it is only entitled to be reimbursed for real property taxes paid with respect to the lot in question for the period January 1, 1962 until the date of the lease out of rentals received for the lot in question." The case was argued on October 22, 1965, and following a vacancy in the court was resubmitted to the court as constituted by the assignment of a circuit court judge to fill the vacancy on January 26, 1966. The only information available in support of Bishop's contention are figures as of June 30, 1963 showing "BISHOP had paid $110,109.10 real property taxes on lots subject to The Agreement after their respective tax accumulation dates, and had received $82,487.50 in rents from lessees under The Agreement. * * *" This information is too limited in scope. It should have been brought up to date at the time of the hearing, and should have included the following facts which have definite bearing in determining the parties' intent in Sections F-8(a) and C-1(c):

(1) Number of tracts developed.
(2) Number of lots developed.
(3) Number of leased lots.
(4) Rentals received from leased lots.
(5) Basic rentals available to Bishop prior to payment of taxes on unleased lots.
(6) Rentals available to Hawaii Kai prior to pay-

ment of taxes on unleased lots.

(7) Number of unleased lots after tax accumulation date.

(8) Taxes "paid" by Bishop on unleased lots after tax accumulation date.

(9) Taxes "payable" by Bishop on unleased lots after tax accumulation date.

(10) Taxes "payable" by Bishop under proration clause on leases executed after tax accumulation date.

(11) Number of tracts and lots in the development stage.

Bishop argues that "The Agreement as a *whole* gives Bishop the right to pay real property taxes under Section C-1(c) out of all monies received from lessees." (Emphasis added). It is impossible to construe The Agreement as a whole absent the information noted above. As I view it, the controversy does not relate to the meaning of the "taxes referred to in Section C-1(c)" used in Section F-8(a), as stated in the submission. It relates to the accounting method used in Section F-8(a) for the payment of "the taxes referred to in Section C-1(c)." The "question in difference" as stated in the submission is too narrow and limited. There are two questions: Under the accounting method outlined in Section F-8(a), (1) is Bishop entitled to reimburse itself for taxes "paid" on an unleased lot from any monies received from lease rentals, or restricted to reimbursement from rentals received from that particular lot after the lot is leased, and (2) is Bishop authorized to pay taxes "payable" on an unleased lot from any monies received from lease rentals, or restricted to such payment from rentals received from that particular lot after the lot is leased? Moreover, these two questions must be considered simultaneously with the accounting method for the payment of basic rentals

under Section F-8(b).

The agreed statement of facts as submitted is too limited to intelligently resolve these questions. The schematic development of the entire area must be thoroughly examined first before a conclusion can be reached as to what the parties intended as the proper accounting procedure for "taxes referred to in Section C-1(c)." The submission controls the issue and this court cannot go beyond the question raised by the parties. *Oleson* v. *Borthwick,* 33 Haw. 766, 794; *Honolulu Rapid Transit Co.* v. *Hawaiian Tramways Co.,* 13 Haw. 363, 377, *appeal dismissed,* 191 U.S. 565 (1903).

The submission was also inadequate in this respect. The Agreement for the development of the land was made a part of the submission. To construe The Agreement as a whole, the construction accorded other paragraphs of The Agreement is needed to determine the "question in difference." This was contemplated by the parties, and they did state in the submission that "all facts which the parties deem relevant to the controversy have been set forth," the parties reserving "the right to argue that some of the facts are immaterial and irrelevant." However, it was evident during argument that the parties disagreed as to essential facts which I believe have a bearing on the "question in difference." Essential facts must be agreed to, and "this court, under the terms of the statute, is without authority to consider any matter [*sic*] of fact which are not agreed to by both parties to the cause." *Oleson* v. *Borthwick, supra,* 33 Haw. at 794, "* * * the parties prescribe the limits of judicial inquiry by the agreed statement of facts. The court is not bound nor expected to go beyond the questions raised by the parties." *Honolulu Rapid Transit Co.* v. *Hawaiian Tramways Co., supra,* 13 Haw. at 377. The submission controls the issues. *Bishop* v. *Mahiko,* 35 Haw. 608. Accordingly, this court should

"in its discretion, require the case to be first submitted to a circuit judge at chambers subject to appeal,"[1] where all the essential facts would then be required and available, and The Agreement considered as a whole to determine whether Bishop has the right under Section F-8(a) to pay the taxes referred to in Section C-1(c) from all monies received from lease rentals.

Inasmuch as the majority has assumed that the submission is in order and has proceeded to adjudge the case on its merits, it is necessary that I note my views on the "question in difference." They are partially based on an interpretation of other paragraphs of The Agreement as well as facts and assumptions which were not included in the submission.

Under C-1(c) Bishop must pay taxes on any residential lot in any subdivision not leased before the tax accumulation date, and these payments are not subject to reimbursement from lease rentals. But, although Bishop must pay all taxes when they fall due on all lots in any subdivision from the tax accumulation date to the date they are leased if monies are unavailable under Section F-8(a), Bishop is *entitled* to reimbursement under the provisions of Section F-8(a). (Emphasis added).

Section F-8 provides that:

"* * * All monies received by BISHOP with respect to one or more Lots covered by any lease or leases thereof made pursuant hereto with parties other than HAWAII KAI or organizations controlling it or controlled by it shall be accounted for by BISHOP in accordance with good accounting practice and shall be paid out in the following order:

"(a) Real property taxes, public improvement assessments, sewer charges (public and private) and

---

[1] Section 227-1, R.L.H. 1955.

other similar charges, if any, against the Lot or Lots in question, and the taxes referred to in Section C-1(c), shall be paid to the public authority or other party entitled thereto before delinquent, and in any event the amounts collected from lessees or others during each fiscal year by BISHOP for any of the foregoing expenses shall be paid out by BISHOP prior to the expiration of such fiscal year of BISHOP."

The monies referred to in Section F-8(a) refer to all monies received by Bishop from outstanding leases of residential, apartment, hotel and commercial lots in any subdivision. First priority on said receipts shall be the payment of (1) "real property taxes * * * if any, against the Lot or Lots in question * * * to the public authority * * * entitled thereto before delinquent, * * *" and (2) "the taxes referred to in C-1(c) * * * to the public authority * * * entitled thereto before delinquent * * *."

Section F-8(a) calls for the payment of two categories of real property taxes. In order to understand these categories, reference must be made to other parts of The Agreement and the tax collection statute.

*First*, the lessee pays the taxes, but "such lease shall provide for the proration of accrued taxes between the lessee and BISHOP * * *." (Section C-1 of Agreement).

*Second*, section 128-32, R.L.H. 1955, as amended, provides for the first one-half payment of real property taxes on June 10 and 25, and the second one-half payment of real property taxes on November 10 and 25 of each year.

*Third*, taxes under C-1(c) between the tax accumulation date which is always January 1, and the date a lot is leased, may be paid by Bishop for one-half year or may not be paid at all. For example: A lot is leased on April 1 after the tax accumulation date. Under the proration clause for leases, Bishop is responsible for the payment of taxes for the first three months. Taxes are due on June

10th. But the first three months' taxes are payable from lease receipts under F-8(a).

*Fourth,* under C-1(a) and (b), the tax accumulation date can be anywhere from 6 to 24 months after the subdivision is completed. The lot may be leased 6 to 24 months before the tax accumulation date, and under the proration clause for leases, Bishop must pay the prorated taxes which are not subject to reimbursement under C-1(c). This payment is not to be treated as paid out under Section F-8(a).

*Fifth,* in C-1(c), the word "paid" in phrase "paid or payable by Bishop" refers to taxes that are actually paid on the due date on unleased lots, and "payable" refers to unpaid taxes on unleased lots that are the responsibility of Bishop as well as taxes under the proration clause for leases executed after the tax accumulation date.

The first category of real property taxes required to be paid in F-8(a) from the lease rentals before they are delinquent are those taxes which have been prorated at the time a lot is leased after the tax accumulation date. These taxes are "payable" by Bishop under C-1(c) but not actually paid since the tax payment date occurs at a later date. It is assumed that lease rentals are payable in advance. Representative copies of executed leases for residential and apartment, hotel or commercial lots were not submitted with the agreed statement.

The second category is the payment of real property taxes "referred to in Section C-1(c)." What are these taxes? There are two parts to C-1(c) which read "taxes paid or payable by Bishop." It is clear that the second part of the phrase, taxes "payable" are taxes on unleased lots from the tax accumulation date, these taxes to be paid as provided for by Section F-8(a) before delinquent. The phrase "BISHOP shall be entitled to reimbursement for such taxes with respect to the Lot in question" refers

to taxes "paid" in the first part of the phrase, and is not applicable to taxes "payable" because the question of reimbursement arises only after Bishop actually pays the taxes.

With reference to the first part of the phrase "taxes paid," Bishop must pay from its own funds taxes on unleased lots only if monies are not available under Section F-8(a). Whatever taxes Bishop may have actually paid on unleased lots from the tax accumulation date as specified in Section C-1(c), it is entitled to reimbursement under F-8(a). As I construe this Agreement, there will be taxes in this classification in the first one or two or three subdivisions where Bishop may have to pay any taxes on unleased lots after the tax accumulation date. Thereafter the question of reimbursement will not arise since there would be lease rentals sufficient to cover all taxes payable under F-8(a). As noted above there is a 6 to 24-month period before the tax accumulation date during which lots are to be leased for rentals payable in advance. Therefore, the possibility of Bishop actually paying taxes for unleased lots after the tax accumulation date may occur only in the first, or second, or third subdivision of the Hawaii Kai development. This would be clearly evident if the agreed statement had been amended at the date of the hearing by including the information noted earlier in this opinion as essential for a fair determination of the "question in difference." As previously stated, a full hearing before a circuit judge is the only practical manner to determine the "question in difference."

I can find nothing in C-1(c) wherein it states that reimbursement for taxes paid on each specific unleased lot shall come only from the lease rental of the specific lot after it is leased. The reference in C-1(c) to "Lot in question" has no significance and does not determine the source of money from which Bishop is to be reimbursed.

The phrase merely identifies the particular lot on which taxes are to be "paid or payable" by Bishop. The payment provisions of all monies received by Bishop are found in Section F-8(a) which mandates the payment of taxes on unleased lots before any other payments are made. Section F-8(a) does not provide for reimbursement to Bishop from lease rentals on a lot by lot basis for taxes paid, nor deferment of reimbursement for taxes paid on each unleased lot until such lot is leased.

If the construction in the majority opinion of Sections C-1(a), (b) and (c) and F-8(a) is followed, basic rentals must also be accumulated and a ridiculous situation would exist. Every subdivision has a few lots in locations that are unattractive and difficult to lease. It would take years before the accumulated taxes are paid and an additional number of years before the accumulated basic rentals are paid. Can it be said that this was intended by the parties in a development agreement, when the owners of the land are trustees of an eleemosynary trust? What about interest on the advance on taxes? In the absence of any mention of interest in The Agreement, will it follow that reimbursement would include the legal rate of interest? Since interest on advance payments is not mentioned, isn't it reasonable to contend that the disbursement provisions of F-8(a) are controlling, and that it was contemplated that the collection of lease rentals in the over-all development was sufficient to pay all taxes on unleased lots before delinquent, still leaving a balance not only to pay basic rentals under F-8(b) but also to pay Hawaii Kai under F-8(c) after deducting basic rentals in F-8(b)?

By requiring Bishop to wait until a lot is leased before it begins to recoup taxes it has paid on the unleased lot from the lease rentals, Hawaii Kai receives an unprecedented windfall. Hawaii Kai has the exclusive right to determine the amount of the Lot Development Pay-

ment for each Lot and is entitled to receive the entire amount thereof from the lessee. In the event the payment is not paid in full by the lessee to Hawaii Kai at the time the lease is executed, "HAWAII KAI shall have the right to take a note or other evidence of indebtedness in favor of HAWAII KAI, signed by the lessee, providing for payment of all or a portion of such Lot Development Payment in installments over such period and including interest on deferred balances as shall be acceptable to HAWAII KAI." In no event does Bishop receive more than 40% of the annual rental, and in some cases only 30%, 20% and 10% for the first 30 years, the balance going to Hawaii Kai.

If the majority view is accepted, Hawaii Kai, receiving rentals from the land in greater percentages than Bishop immediately after the execution of leases, can apply these rentals to immediately pay off lot development costs of unleased lots and recoup them later when the lot is leased. But Bishop, the owner of the lots, on the other hand, is unable to apply lease rentals from other lots to pay taxes on unleased lots. Hawaii Kai does not have to pay interest on these payments. Hawaii Kai does not have to worry about recoupment of lot development costs on unleased lots because these costs must be paid by the lessee if and when the lot is leased, and this can be an indefinite period after the termination of The Agreement. Furthermore, the Lot Development Cost can include interest because Hawaii Kai has the exclusive right to determine the amount of this cost. Likewise, Hawaii Kai, after the lot is leased and accumulated taxes and accumulated basic rentals are paid, will receive the difference between the fixed annual rental and the basic rental for the first 30-year period of the lease, which may be 30 or 40 years after the termination of The Agreement.

Judgment should be entered declaring that Bishop is

entitled to reimburse itself for sums which it may have "paid" for taxes on unleased lots from lease rentals received from lessees of other residential, apartment, hotel and commercial lots, other than Hawaii Kai or organizations controlling it or controlled by it, and from said lease rentals to first pay all real property taxes "payable" on unleased lots in any subdivision under the provisions of F-8(a).