577 F.2d 568
 27 UCC Rep.Serv. 32
 UNITED STATES of America for the Use and Benefit of UNION
BUILDING MATERIALS CORP., Plaintiff-Appellee,
v.
HAAS AND HAYNIE CORPORATION and the Aetna Casualty and
Surety Company, Defendants-Appellants.
 No. 75-3078.
 United States Court of Appeals,
Ninth Circuit.
 June 26, 1978.
 
 Warren Price, III, Honolulu, Hawaii, for plaintiff-appellee.
 Jerry A. Ruthruff, Honolulu, Hawaii, for defendants-appellants.
 Appeal From the United States District Court for the District of Hawaii.
 Before WRIGHT and SNEED, Circuit Judges, and RENFREW,* District Judge.
 SNEED, Circuit Judge:
 
 
 1
 This case, brought pursuant to the Miller Act, 40 U.S.C. § 270b, requires us to review the district court's interpretation of a contract between the prime contractor and a subcontractor. The parties gave differing meanings to the payment clause of their contract and the issue presented to this court is the determination of whose meaning should prevail. We find that the contract was ambiguous and that the district court was not clearly erroneous in finding that the contract should be interpreted in favor of appellee, Union Building Materials Corp. Accordingly, we affirm.
 
 I.
 
 2
 The Facts.
 
 
 3
 In December 1972, appellant Haas and Haynie Corporation (hereinafter H & H) entered into a contract with the United States for the construction of the United States Courthouse and Federal Office Building in Honolulu, Hawaii. H & H, as prime contractor, soon began the process of lining up subcontractors. In February 1974, H & H entered into a subcontract with appellee Union Building Materials Corporation (hereinafter UBM) for the acquisition and installation of padding and carpeting for the building.
 
 
 4
 UBM was a new business at the time it entered into this agreement. The primary focus of the business was the sale of lumber products, but approximately 20% of sales came from carpet products. UBM's owner, Keith Kranz, had previously worked for a similar company, but this was his first independent venture as a carpeting subcontractor. During the initial negotiations leading to the signing of this contract, Kranz stated repeatedly that UBM's financial condition was not yet strong and that an immediate cash flow from this project would be necessary. Despite these discussions the standard form subcontract documents normally used by H & H were also used to evidence this contract.
 
 
 5
 Article XXX of the Subcontract Agreement provides that the subcontractor shall be paid monthly for the aggregate value of the work performed less a 10% retention. Section 12.4 of the Specifications and Bid Forms, which were incorporated into the contract, provides that "material delivered that will be incorporated into the structure will be taken into consideration in computing progress payments . . . . Before each such payment is made . . . the Contractor shall furnish to the Contracting Officer such evidence as he may require as proof of the quantity and value of such materials". Section 12.2 provides that a breakdown of the contract price must be made. "The values in the breakdown will be used for determining progress payments. The Contractor's overhead, profit and cost of bonds shall be prorated through the life of the contract." The specific issue presented by this case is whether the payment made to the subcontractor for materials delivered but not yet installed should include a proportion of the total overhead and profit for the job.
 
 
 6
 H & H requested a breakdown of the total contract price from UBM soon after the contract was signed. In that breakdown UBM allocated $125,000 to the carpet padding. UBM proceeded to order the carpet padding from General Felt Corporation. The manufacturer's price for the padding allocated to the federal project was approximately $68,000. UBM nevertheless submitted to H & H an invoice for the full $125,000 which it had originally allocated to the padding. H & H accepted this invoice and forwarded it to the government for payment in late May of 1974. H & H received full payment from the government in June.
 
 
 7
 There was conflicting testimony as to when H & H discovered that the invoice was for more than the manufacturer's price for the padding. The district court found that H & H did not notify the government of any problem and that the General Services Administration (GSA) did not discover the problem until October 1974, as a result of an investigation instigated by Senator Fong as to why UBM had not received any payment at all. In November 1974, the government withdrew credit for all but $60,000 of the contested payment. Meetings were held during the summer and fall in an effort to resolve the dispute. At a meeting on August 31 there was discussion of a compromise payment of $92,000 to UBM. These negotiations failed and this lawsuit was filed in late October 1974.
 
 
 8
 After a non-jury trial the district court found in favor of plaintiff UBM. The findings of fact and conclusions of law entered by the court reflect some confusion as to the legal basis for that holding. Initially the court concluded that the contract was ambiguous and should be interpreted against the draftsman, H & H. The court then went on to conclude further that UBM was unilaterally mistaken about the contract's meaning and should be granted relief from that mistake because of H & H's failure to inform UBM of that mistake. H & H's appeal from that decision brings the case before this court. Although the district court appears to have considered unilateral mistake as a ground of relief distinct from that available through proper interpretation of an ambiguous contract, no such distinction exists under the circumstances of this case. The focus, in any event, must be upon a failure of communication between the parties. The prevailing understanding where communication fails is that which was known, or ought to have been known, by the other. General contract interpretation principles, not unilateral mistake, is the form in which we think our analysis is better cast.[1]II.
 
 
 9
 Contract Interpretation.
 
 
 10
 We start by noting that we are dealing with a written document which contains an express integration clause. It is thus necessary to determine whether the district court properly admitted extrinsic evidence in the process of interpreting the contract, a determination that requires a finding with respect to the ambiguity of the writing. Extrinsic evidence is properly admitted to help ascertain the intended meaning of ambiguous writings. Restatement (Second) of Contracts, § 238; U.C.C. § 2-202; Haw.Rev.Stat. § 490:2-202.[2]
 
 
 11
 A. Was the Contract Ambiguous?
 
 
 12
 Appellant challenges the district court's determination that the contract was ambiguous in regard to the method of payment for materials delivered but not yet installed. Such a finding presents a question of law, freely reviewable by this court. United States ex rel. White Masonry, Inc. v. F. D. Rich Co., 434 F.2d 855, 858 (9th Cir. 1970); Clayman v. Goodman Properties, Inc., 171 U.S.App.D.C. 88, 96, 518 F.2d 1026, 1034 (1973). Reviewing the written documents which comprise the contract, we are unable to determine whether any payment for profit and overhead was intended to be included in the payment made for materials delivered but not yet installed. The contract merely specifies that payments relating to such material can be made only after proof of the quality and value of such materials is presented. There is no further specification of how value is to be computed. Neither price to the subcontractor nor price to the prime contractor are unreasonable definitions of value. The general reference to profit and overhead being prorated throughout the life of the contract is also ambiguous as to whether payments made prior to beginning work on the contract are to include allowance for profit and overhead. Thus, we find that the contract is ambiguous as to the amount of the payment due on delivery of material.[3] In this situation it was therefore proper for the district court to hear extrinsic evidence to determine the intent of the parties regarding this issue.
 
 
 13
 B. Interpreting an Ambiguous Contract.
 
 
 14
 The interpretation of an ambiguous contract is a mixed question of fact and law. United States v. Lewiston Lime Co., 466 F.2d 1358, 1359, fn. 1 (9th Cir. 1972). The factual findings by the lower court as to what the parties said and did must be accepted unless clearly erroneous. Saturn Oil and Gas Co. v. Northern Natural Gas Co., 359 F.2d 297, 302 (8th Cir. 1966). The principles of contract interpretation to be applied to those facts, however, are legal issues which this court can review. Cf. Restatement (Second) of Contracts, § 228; McClung v. Thompson, 401 F.2d 253, 257-58 (8th Cir. 1968) (interpretation of ambiguity is "a question for the jury, under proper instructions, to resolve").
 
 
 15
 A threshold question where the parties attached different meanings to an ambiguous clause is whether the parties have made a binding contract on this issue at all.[4] If neither party knows or has reason to know the meaning attached by the other, or if both parties know or have reason to know the meaning attached by the other, then there is no contract. Restatement (Second) of Contracts, § 21A(1). However, if only one party knows or has reason to know of the conflict in meaning, the contract will be interpreted in favor of the party who does not know of the conflict. Restatement (Second) of Contracts, §§ 21A(2), 227(2) and 238. Therefore the crucial factual issue in this case is whether either party knew or had reason to know of the meaning given to the contract by the other. Emor, Inc. v. Cyprus Mines Corp., 467 F.2d 770, 775 (3rd Cir. 1972).
 
 
 16
 1. Knowledge or Reason to Know of Other's Interpretation.
 
 
 17
 The district court found that neither side had actual knowledge of the expectation of the other at the time the contract was entered into; but the lower court made no explicit findings with respect to whether either had reason to know of the other's understanding. Nevertheless, we hold that H & H had reason to know that UBM expected recovery of some profit and overhead at the time of delivery of the material. UBM indicated during pre-contract negotiations that it was important that it receive an early cash flow on this project because it could not carry the expense by itself. The court specifically found that H & H had been informed both of the proposed cost breakdown on the project and that Mr. Kranz expected progress payments. Finding of Fact # 7. This finding appears inconsistent with Finding of Fact # 9, in which the court said that H & H did not know of UBM's expectation of progress payments. These two findings can be reconciled by concluding that Finding of Fact # 9 is referring to actual knowledge, while Finding of Fact # 7 is concerned with reason to know. Thus, under this interpretation of the factual findings, we regard the district court as having found that H & H had reason to know the meaning attached by UBM.
 
 
 18
 2. Trade Usage.
 
 
 19
 Appellant argues, however, that since the trade custom was not to allow for recovery of profit and overhead on delivery of materials, UBM should be found to have reason to know that such was the meaning attached by H & H. We agree that trade practices are a legitimate way of supplying the inference that one had reason to know of a given meaning. Restatement (Second) of Contracts, § 246(2). The district court specifically found that H & H's interpretation did reflect the trade custom. Since this finding is not clearly erroneous, we accept the existence of such a trade custom. U.C.C. § 1-205(2); Haw.Rev.Stat. § 490:1-205(2).
 
 
 20
 However, trade usages are not automatically binding on all persons. The party sought to be bound by the trade usage must be in a position to know of that usage. Restatement (Second) of Contracts, § 246(2) (must have reason to know of the usage); U.C.C. § 1-205(3); Haw.Rev.Stat. § 490:1-205(3) (should be aware of the usage). It is well settled that in order to be bound by trade custom, it must be shown that the custom is so generally known that the parties may be presumed to have known of it. PSG Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 417 F.2d 659, 662 fn. 7 (9th Cir. 1969), cert. denied, 397 U.S. 918, 90 S.Ct. 924, 25 L.Ed.2d 99 (1970); United States ex rel. Shields, Inc. v. Citizens and Southern National Bank, 367 F.2d 473, 477 (4th Cir. 1966) (universal and all-pervading); Heggblade-Marguleis-Tenneco, Inc. v. Sunshine Biscuit, Inc., 59 Cal.App.3d 948, 131 Cal.Rptr. 183 (1976) (general and universal application).
 
 
 21
 The district court found that UBM was "a brand-new comer (sic) into the field of carpent (sic) subcontracting" and "was unfamiliar with government contracts and the interpretation thereof." Finding of Fact # 6. The district court also found, however, that "UBM was not in the trade." Finding of Fact # 10. While apparently contradictory, we think these findings can be viewed as a statement by the court that because UBM was a newcomer to the field, it had no reason to know of the trade custom and so should not be bound by it. Viewed in this manner, the findings are not clearly erroneous.
 
 
 22
 These not altogether harmonious findings amount to this. Neither party knew of the meaning attached by the other. UBM did not have reason to know of the trade custom, but H & H did have some reason to know of UBM's meaning. Therefore, we hold that a contract was formed according to the meaning given by UBM.
 
 
 23
 3. Course of Performance.
 
 
 24
 Our holding is strengthened by examining the conduct of the parties during performance. The practical construction given an agreement by the parties is relevant to fixing the meaning of an ambiguous provision. The principle is clearly operative where there are repeated occasions for performance. Restatement (Second) of Contracts, § 228(4); U.C.C. § 2-208(2); Haw.Rev.Stat. § 490:2-208(2). Although only one payment was ever demanded under this contract, case law has recognized that "subsequent action of the parties in construing the contract cannot be ignored as evidencing the intent of the parties." In Re Taxes of Aiea Dairy, Ltd., 46 Haw. 292, 380 P.2d 156, 163 (1963). See also Riess v. Murchison, 329 F.2d 635, 642 (9th Cir. 1964), cert. denied, 383 U.S. 946, 86 S.Ct. 1196, 16 L.Ed.2d 209 (1966); Hutchins v. Bethel Methodist Home, 370 F.Supp. 954, 962 (S.D.N.Y.1974); Corbin on Contracts, § 558.
 
 
 25
 In this case H & H accepted the $125,000 invoice from UBM and forwarded it to the government for payment. H & H then received full payment from the GSA. This suggests initial acquiescence in UBM's interpretation of the contract. Furthermore, the district court also found that H & H never informed either the GSA or UBM of the alleged error, a failure that also indicates that H & H had agreed to this interpretation. While this evidence is not conclusive, it supports our conclusion that the contract should be given the meaning ascribed to it by UBM.
 
 
 26
 4. Construction Against Drafting Party.
 
 
 27
 Our conclusion is also supported by the general rule that an ambiguity will be resolved against the one who prepared the document. We recognize that this rule should be applied only "where, after examining the entire contract, the relation of the parties, their intentions, and the circumstances under which they executed the contract, the ambiguity remains unresolved." United States ex rel. Yardley Drilling Co. v. Erickson Paving Co., 465 F.2d 396, 400 (9th Cir. 1972); see also Saturn Oil and Gas Co. v. Northern Natural Gas Co., supra at 302. These conditions are met in this case. Thus, since this was a standard form contract presented by H & H to UBM with little opportunity for negotiation, any remaining ambiguity should be resolved against H & H, the draftsman. We therefore affirm the district court's action in interpreting the ambiguous contract to mean that profit and overhead could be recovered in a payment for materials delivered but not yet installed.
 
 
 28
 AFFIRMED.
 
 RENFREW, District Judge, dissenting:
 
 29
 This case presents some of the difficult problems raised when overworked trial judges adopt without change the findings of fact and conclusions of law prepared by a prevailing party. This Court has in the past disapproved of this practice, as have many others. E. g., Industrial Building Materials, Inc. v. Interchemical Corp., 437 F.2d 1336, 1339-1340 (9 Cir. 1970); see also State of Fla., etc. v. Charley Toppino & Sons, Inc., 514 F.2d 700, 703 (5 Cir. 1975); Kelson v. United States, 503 F.2d 1291, 1294-1295 (10 Cir. 1974); Roberts v. Ross, 344 F.2d 747, 751-752 (3 Cir. 1965). Although such findings will stand if supported by the evidence, they present special problems for a reviewing court. See United States v. El Paso Natural Gas Co., 376 U.S. 651, 656-657 & n.4, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964). Even in complex patent cases, where the permissibility of adopting findings prepared by counsel has generally been recognized, this Court has stated that " 'an appellate court will scrutinize (such findings) more carefully than findings which are the product of the judge's own independent thought and research.' " Kamei-Autokomfort v. Eurasian Automotive Products, 553 F.2d 603, 606 (9 Cir.), cert. denied, 434 U.S. 860, 98 S.Ct. 186, 54 L.Ed.2d 133 (1977), quoting Burgess & Associates, Inc. v. Klingensmith, 487 F.2d 321, 324-325 (9 Cir. 1973) (citation omitted).
 
 
 30
 In this case, the findings stray so far from revealing "the discerning line for decision of the basic issue in the case," United States v. El Paso Natural Gas Co., supra, 376 U.S. at 657, 84 S.Ct. at 1047, that I must respectfully dissent. The crucial problem is that the findings of fact on the two key questions in the case do not deal directly with the relevant issues of ultimate fact, and, on the points they do address, are directly contradictory.
 
 
 31
 Thus, on the issue of whether either party knew or had reason to know of the other's interpretation of the contract regarding progress payments, we have only Findings of Fact # 7 and # 9, which read as follows:
 
 
 32
 "7. That prior to the signing of the subcontract, UBM showed H & H its proposed costs. Mr. Kranz of UBM indicated at this time that he expected progress payments would be made under the contract."
 
 
 33
 "9. That H & H did not know of Plaintiff's expectation of progress payments at the time of the signing of the subcontract and did not intend to pay progress payments."
 
 
 34
 The direct contradiction in these findings makes any attempt to discern the basis of decision on this point highly speculative. The greatest difficulty, however, is that even if the findings can be reconciled, they do not address the real issue here. There has never been any dispute that progress payments were required under the subcontract. Subcontract Agreement Article XXX. Indeed, to the extent that Finding of Fact # 9 states that H & H intended to disregard this express contractual obligation, it is without support in the evidence and clearly erroneous. The only issue is whether payments made for materials delivered but not yet installed were to include a portion of the total overhead and profit for the job. Findings of Fact # 7 and # 9 deal only with expectations that progress payments would be made. They cannot assist us in determining what the district court concluded as to the parties' understanding on the more specific point which is at issue in the case, or what facts may have led him to that conclusion.
 
 
 35
 On the other major issue the effect of trade usage the problems are equally serious. No finding deals with the understanding in the trade regarding payment for materials delivered but not yet installed. The only potentially relevant finding is Finding of Fact # 10, which reads as follows:
 
 
 36
 "10. That the terms of payment for materials delivered but not installed under the sub-contract provide that payment for materials is made at the invoice price less 10% retention. In the trade everyone recognizes that 'invoice' means the manufacturer's price to the sub-contractor. UBM was not in the trade and UBM thought invoice meant its price to H & H. Neither of the parties was using the word 'invoice' in the same meaning as the other party."
 
 
 37
 This finding is clearly erroneous at the outset, since neither the subcontract agreement nor the supporting contract documents use the word "invoice" in this connection. The record indicates that "invoice" in this sense appears only in a series of letters exchanged by the parties more than a month after the agreement was signed, and in information allegedly given to Mr. Kranz orally by an H & H employee, also after the agreement was signed. There is no finding that either the letters or the conversations effected a modification in the subcontract to include any reference to or understanding of the word "invoice".
 
 
 38
 Although there appears to be evidence supporting the conclusion that the trade practice in government contracting situations was that payments for materials would be made at the rate of manufacturer's invoice less 10% retention regardless of the express terms of the contract, the district court made no such finding. Even if this Court were to supply it, the findings are in a state of confusion as to UBM's status in the trade a fact which is crucial to the determination of whether UBM can reasonably be charged with notice of the trade usage in question. The district court found both that UBM was "not in the trade", Finding of Fact # 10, and that UBM was a "brand-new comer (sic) into the field of carpent (sic) subcontracting and bidding on government jobs." Finding of Fact # 6. If UBM was in fact not in the trade at all, it could not be charged with knowledge of trade usage unless that usage was known in the community outside the trade. Cf. Frigaliment Importing Co. v. B.N.S. International Sales Corp., 190 F.Supp. 116, 119 (S.D.N.Y.1960) (New York law). There is no finding on this point. On the other hand, if UBM held itself out as engaging in the trade, even as a newcomer, it may well be reasonable to charge it with a duty to ascertain customs universally known in the trade. In these circumstances, those parties with whom UBM contracted would be entitled to rely on the assumption that UBM understood such customs. Because of the vast difference between these two conclusions, the direct contradiction on this point again suggests that any attempt to discern the actual basis for decision here must be conjectural.
 
 
 39
 Although I deplore the delay and expense necessitated by a remand in this case, I am convinced that the findings of fact and conclusions of law do not enable this Court to determine the grounds or the factual predicates on which the district court based its decision and thus cannot provide the necessary basis for review. Alpha Distrib. Co. of Cal., Inc. v. Jack Daniel Distillery, 454 F.2d 442, 453 (9 Cir. 1972); Roberts v. Ross, supra, 344 F.2d at 751. On the two major issues in the case, the findings are internally contradictory and, even if reconciled, fail to address the relevant facts. I recognize that an appellate court is permitted to make its own findings in an appropriate case. Alpha Distrib. Co. of Cal., Inc. v. Jack Daniel Distillery, supra, 454 F.2d at 453; Oil, Chemical and Atomic Workers Intern. Union v. N.L.R.B., 178 U.S.App.D.C. 301, 307, 547 F.2d 575, 581 (1976), cert. denied, 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977). But I am unable to find the record so clear that a full understanding of the issues can be reached without the aid of findings by the court below. Nor can these two issues be ignored, and the interpretation of the contract be based solely on course of performance and construction against the drafting party. Those subsidiary aids to interpretation must ordinarily yield to the more direct evidence of intent available in this record.
 
 
 40
 Because I am convinced that an affirmance in this case requires this Court to weigh conflicting evidence and to reach its own findings of fact in the guise of reconciliation and construction, I would vacate the judgment and remand the cause to the district court for reconsideration of the entire record and preparation of supplemental findings of fact and conclusions of law.[1]
 
 
 
 *
 Hon. Charles B. Renfrew, United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 The Ninth Circuit has held that in Miller Act cases to which the United States is not a party, i. e., a dispute between the prime contractor and the subcontractor, as here, state rather than federal substantive law prevails. United States ex rel. Building Rentals Corp. v. Western Casualty and Surety Co., 498 F.2d 335, 338 fn. 4 (9th Cir. 1974); United States ex rel. Briggs v. Grubb, 358 F.2d 508, 515 (9th Cir. 1966). Even though H & H is a California corporation, the fact that UBM is a Hawaiian corporation and that the contract at issue was both executed and to be performed in Hawaii makes Hawaiian law seem most applicable. See Wells Benz, Inc. v. United States ex rel. Mercury Electric Co., 333 F.2d 89, 92 (9th Cir. 1964). Nonetheless, since Hawaiian case law regarding contract interpretation is sparse, we will have to assume that a Hawaii state court would apply general contract principles. This assumption is justified by reference to the Restatement of Contracts in several Hawaii cases. In Re Taxes of Aiea Dairy, Ltd., 46 Haw. 292, 380 P.2d 156 (1963); Kaiser Hawaii Kai Development Co. v. Murray, 49 Haw. 214, 412 P.2d 925 (1966). We will look to the Restatement (Second) of Contracts as a primary source for the most recent statement of these general principles
 
 
 [2]
 There is some question as to whether Article 2 of the Uniform Commercial Code is applicable to the contract at issue here. Article 2 applies to the sale of goods and this contract involves both sale of goods and provision of services. The modern trend is to apply Article 2 to such mixed sales/services contracts. Bonebrake v. Cox, 499 F.2d 951, 958 (8th Cir. 1974); Worrell v. Barnes, 87 Nev. 204, 484 P.2d 573 (1971). We do not need to decide how Hawaii would resolve this issue, however, because the result we reach is the same whether or not the U.C.C. is applied. References to the U.C.C. will be given to show the similarity in approach between the Restatement (Second) and the U.C.C
 
 
 [3]
 Since, under the standard of review discussed above, this court has independently determined that the contract is ambiguous on this issue, we do not have to deal with appellant's argument that the district court only found that the contract was "ambiguous to UBM."
 
 
 [4]
 A failure to have a binding contract on a particular issue will not preclude the existence of a contract with respect to other issues unless the failure pertains to an essential term of the agreement. Corbin on Contracts § 95. Restatement (Second) of Contracts, § 32, Comment a
 
 
 [1]
 It is worth noting that such action has not always resulted in purely formalistic and insubstantial changes in findings on remand. In Roberts v. Ross, supra, 344 F.2d 747, the district court reversed its former decision after reconsideration of the record, and held on remand for the party against whom it had held initially. See C. Wright & A. Miller, Federal Practice and Procedure § 2578, at 706 n.16 (1971)