**WESTOVER, Collector of Internal Revenue**

v.

**WILLIAM SIMPSON CONST. CO. et al.**

**No. 13377.**

United States Court of Appeals Ninth Circuit.

Jan. 28, 1954.

Ellis N. Slack, Asst. Atty. Gen., Fred Youngman, Sp. Asst. to Atty. Gen., Laughlin E. Waters, U. S. Atty., Edward H. Mitchell, Edward R. McHale, Asst. U. S. Attys., Los Angeles, Cal., for appellant.

·Dempsey, Thayer, Deibert & Kumler, Arthur H. Deibert, A. L. Burford, Jr., Los Angeles, Cal., for appellee.

Before HEALY, BONE, and POPE, Circuit Judges.

HEALY, Circuit Judge.

This is an appeal by the Collector from a judgment directing the refund of income withholding taxes on wages and kindred taxes on employers, exacted of appellees as prime contractors after default in payment thereof by their subcontractor.

The facts, in part stipulated, are not materially in dispute, although the inferences the parties draw from them are at variance. In April of 1944 appellees, who will generally be referred to as Simpson-Kier, jointly contracted with the Navy Department for certain construction work at Seal Beach, California. As required by the Miller Act, Simpson-Kier furnished a payment bond to the United States for the protection of persons supplying labor or materials for the job. In furtherance of the enterprise they entered into various subcontracts one of which was with United Concrete Form Products Company. United, in order to finance the subcontract, negotiated a loan from the Aetna Bank in Chicago, as security for which the latter required that the subcontract be assigned to it and that amounts becoming due thereunder be paid through the bank.

In August 1944 United notified Simpson-Kier that Aetna would not make further advances, and it requested Simp-

son-Kier to advance United sufficient funds to complete the work, stating that an analysis of the job indicated a probable loss to United of about $40,000. At that time more than half the work under the subcontract had been completed, and there was a balance owing United under it of approximately $149,000. A meeting was held between representatives of United and Simpson-Kier to discuss the matter and to arrange procedures. Under the terms of the subcontract Simpson-Kier had the option, among others, of advancing to United sufficient funds to complete the subcontract and to deduct the same from the amount to be paid United. The latter was at that time negotiating a similar subcontract at Port Chicago at prices which were thought by its president to indicate a substantial profit. United also had contracts then in progress at various other military installations from which it expected to receive additional funds; and from these several sources it anticipated that money would flow enabling it to satisfy all its obligations. Simpson-Kier agreed to advance United sufficient funds in payment of labor claims to meet the net "take-home" pay of United's employees. It was agreed that the subcontract was to continue in full force and that the money advanced would represent only amounts actually earned by the subcontractor at the time advanced, and that the advances would be made only for the purpose of paying lienable claims. The work being done was of an emergency nature and it was deemed of importance that it be not disrupted. United assured the prime contractor that with these advances it would be able to take care of its obligations, its payroll taxes, and its material suppliers.

United opened a "payroll trust account" at its bank, and the advances made by Simpson-Kier were deposited in this account. Checks on the account could be signed only by a Mr. Weber, project manager for United, or by a Mr. Noble, personnel manager for Simpson-Kier. Noble was authorized to sign checks because Weber was out in the field a great deal of the time, and United's president had specifically requested that Noble be permitted to sign checks as a matter of convenience to United. No representative of Simpson-Kier had or exercised any supervision over or any authority to hire or fire any employee of United. Simpson-Kier, in lieu of the semimonthly progress payments provided in the contract, undertook to and did accelerate payment by making weekly advances to United of the amounts required to meet its net weekly payroll. At the time of each such advance United had performed enough work to have earned it. Simpson-Kier was reassured by United that the latter would have ample funds from other sources to pay all taxes to become due with respect to such payrolls. The obligation to pay all taxes with respect to employees of United rested expressly upon the latter under the terms of the subcontract.

During the period from the making of this arrangement until the end of October 1944, when the work under the subcontract was completed, Simpson-Kier advanced United, through the latter's payroll trust account, the amounts necessary to take care of the net take-home pay of United's employees. United duly filed with the Internal Revenue people returns for the period, including the income withholding and other payroll taxes with respect to its employees, but did not pay the amounts becoming due thereon. Having failed to collect the taxes from United, the Collector looked to Simpson-Kier, who thereafter paid them under protest and brought this suit for refund.

The taxes involved are of three types: Income withholding taxes,[1] Federal In-

---

1. "§ 1622. Income tax collected at source
"(a) Requirement of withholding. Every employer making payment of wages shall deduct and withhold upon such wages a tax equal to * * *." 26 U.S.C.A. § 1622.

"§ 1623. Liability for tax
"The employer shall be liable for the payment of the tax required to be deducted and withheld * * *." 26 U.S.C.A. § 1623.

surance Contributions,[2] and Federal Unemployment Taxes.[3] We turn briefly to those of the second and third variety. As a condition precedent to liability for either of them there must have subsisted during the period in question an employment relationship between Simpson-Kier and United's employees as defined in the statutes. The definitions are set out in the margin.[4] It is evident that the requisite relationship did not obtain, and the trial court was right in so holding.

In respect of obligations of the first type—the income withholding tax—the statutory definition of the term "employer" is not materially different from the ordinary concept of such relationship. However, certain exceptions are incorporated to take care of special cases, one of which exceptions needs to be noticed in considering the government's argument pertaining to this particular tax. The definition, found in § 1621(d) of the Code,[5] so far as here pertinent is as follows: "(d) Employer. The term 'employer' means the person for whom an individual performs or performed any service, of whatever nature, as the employee of such person, *except that—(1) if the person for whom the individual performs or performed the services does not have control of the payment of the wages for such services, the term 'employer' * * * means the person having control of the payment of such wages; * * *.*" [Emphasis supplied.]

The government contends that the arrangement between the parties for completion of the work left Simpson-Kier in control of the payment of wages, hence

---

2. "**§ 1400. Rate of tax**
"In addition to other taxes, there shall be levied, collected, and paid upon the income of every individual a tax equal to the following * * * received by him after December 31, 1936, with respect to employment (as defined in section 1426(b)) * * *." 26 U.S.C.A. § 1400.

"**§ 1401. Deduction of tax from wages**
"(a) Requirement. The tax imposed by section 1400 shall be collected by the employer of the taxpayer, by deducting the amount of the tax from the wages as and when paid.

"(b) Indemnification of employer. Every employer required so to deduct the tax shall be liable for the payment of such tax, * * *." 26 U.S.C.A. § 1401.

"**§ 1410. Rate of tax**
"In addition to other taxes, every employer shall pay an excise tax, with respect to having individuals in his employ * * * paid by him after December 31, 1936, with respect to employment (as defined in section 1426(b)) * * *." 26 U.S.C.A. § 1410.

3. "**§ 1600. Rate of tax**
"Every employer * * * shall pay for the calendar year 1939 and for each calendar year thereafter an excise tax, with respect to having individuals in his employ, * * * paid by him during the calendar year with respect to employment (as defined in section 1607(c)) * * *." 26 U.S.C.A. § 1600.

4. Respecting the Federal Insurance Contributions tax, the definitional section states that "the term 'employment' means any service performed after 1936 and prior to 1951 which was employment for the purposes of this subchapter under the law applicable to the period in which such service was performed * * *." 26 U.S.C.A. § 1426(b). The services in question having been rendered in 1944, the applicable law is found in the Social Security Amendments of 1939, where "employment" is defined as "any service, of whatever nature, performed after December 31, 1939, by an employee for *the person employing him.*" [Emphasis added.] 53 Stat. 1384. It is clear that as between two possible employers, the one exercising continuous control is "the person employing". Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947.

As to the Federal Unemployment tax, the pertinent section similarly states that "the term 'employment' means any service performed prior to July 1, 1946, which was employment as defined in this section as in effect at the time the service was performed * * *." 26 U.S.C.A. § 1607(c). The contemporary law then stated that "employment" means "any service, of whatever nature, performed after December 31, 1939, within the United States by an employee for *the person employing him* * * *." [Emphasis added.] 53 Stat. 1393. The analysis in Bartels v. Birmingham, supra, is also applicable here.

5. 26 U.S.C.A. § 1621(d).

Simpson-Kier must under the exception be considered the employer. We do not agree. To render the exception applicable two things must be shown: (1) that United had no control over the payment of the wages, and (b) that Simpson-Kier had. Obviously the requirement was not met. Whatever measure of control Simpson-Kier might have had it was not exclusive, but was shared with United. United made up the payroll, the wages were paid from United's checking account and a United employee had and exercised the power to sign the paychecks. Indeed, it is doubtful whether Simpson-Kier had any control over the wage payments. While it supplied the money, it did so only in fulfillment of the agreement, and United had earned the money by the time it was deposited in the special account. The legislative history of § 1621(d) makes it clear that something more than the mere supplying of the money for the payroll is essential.[6] However, since it is manifest that Simpson-Kier did not have the measure of control of the wage payments required by the statutory exception, it is unnecessary to determine that it had no control at all.

The government advances other arguments respecting all three types of tax.

One of these is that the supplemental agreement amounted to a third party beneficiary contract, the United States being the third party beneficiary. We shall not undertake to discuss the theory beyond saying that it has no basis in the facts of the case. The supplemental agreement had the exclusive purpose of enabling United to pay the take-home wages of its employees. Simpson-Kier undertook only to accelerate payments to United under the contract. It assumed no obligations either to the employees of United or to the government.

A final argument has to do with the payment bond supplied by Simpson-Kier under the requirements of the Miller Act, 40 U.S.C.A. § 270a et seq.[7] The purpose of this bond was to protect laborers and materialmen. It was not intended, as counsel for the Collector argue, to assure payment to the government of withholding or payroll taxes. Cf. United States Fidelity & Guaranty Co. v. United States, 10 Cir., 201 F.2d 118. To hold that it is usable as a weapon in the collection of taxes would be an arbitrary perversion of the legislative purpose.

Affirmed.

6. See Conference Rep.No. 510, 78th Congress, 1st Session, 1943 Cum.Bull. 1351, 1353. This report states that the House bill provided an exception to the general definition of the term "employer" by providing that "if the wages are paid by a person other than the person from whom the services are or were performed, the term 'employer' means the *person paying such wages*. The Senate bill has restated the exception in order to make clear that it is designed solely to meet unusual situations and not intended as a departure from the basic purpose to centralize responsibility for withholding, returning, and paying the tax and furnishing receipts. Accordingly, the Senate bill provides in section 1621(d) (1) that if the person for whom the services are or were performed *does not have control of the*

*payment of the wages* for such services the term 'employer' means the person having control of the payment of such wages." [Emphasis supplied.]

7. In pertinent part the Act is as follows:
"§ 270a. * * *
"(a) Before any contract, exceeding $2,000 in amount, for the construction, alteration, or repair of any public building or public work of the United States is awarded to any person, such person shall furnish to the United States the following bonds * * *
"(1) * * *.
"(2) A payment bond with a surety or sureties satisfactory to such officer for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person."