288 F.3d 1161
 ISLAND INSURANCE COMPANY, LTD., Plaintiff-Appellee,
v.
HAWAIIAN FOLIAGE & LANDSCAPE, INC., a Hawaii corporation; Kenneth Kato; Oahu Construction Company, a Hawaii corporation; State of Hawaii, a governmental entity; Seiji Naya; Ray K. Kamikawa; Lorraine H. Akiba; CB Bancshares, Inc., a Hawaii corporation, Defendants, and
United States of America, a governmental entity, Defendant-Appellant.
Island Insurance Company, Ltd., Plaintiff-Appellee,
v.
Hawaiian Foliage & Landscape, Inc., a Hawaii corporation; Kenneth Kato; Oahu Construction Company, a Hawaii corporation; United States of
America, a governmental entity; Seiji Naya; Ray K. Kamikawa; Lorraine H. Akiba; CB Bancshares, Inc., a Hawaii corporation, Defendants, and
State of Hawaii, a governmental entity, Defendant-Appellant.
 No. 00-16874.
 No. 00-16940.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted November 6, 2001.
 Filed May 3, 2002.
 
 John A. Dudeck, Jr., Tax Division, United States Department of Justice; Roxann C. Bulman and Kurt Kawafuchi, Department of the Attorney General, State of Hawaii, for the defendants-appellants.
 Michael N. Tanoue, The Pacific Law Group, Honolulu, HI, for the plaintiff-appellee.
 Appeal from the United States District Court for the District of Hawaii; David A. Ezra, District Judge, Presiding. D.C. No. CV-97-01084-DAE.
 Before: THOMPSON, O'SCANNLAIN and BERZON, Circuit Judges.
 BERZON, Circuit Judge.
 
 
 1
 The question in this case is whether the government is an intended beneficiary, for the purpose of securing the payment of taxes due, of the surety bond that insured a subcontractor's performance. Parties to surety contracts are free, of course, to choose whether or not to insure for tax obligations. We interpret the language of the contract in this case to have done so, and therefore hold that both the state and federal governments are intended beneficiaries of the surety contract to the extent of the subcontractor's past due tax obligations.
 
 BACKGROUND
 
 2
 Oahu Construction Co. ("Oahu" or "obligee" or "prime contractor") contracted with the City and County of Honolulu to build a golf course. Oahu subcontracted some landscaping work to Hawaiian Foliage & Landscape, Inc. ("Hawaiian" or "subcontractor" or "principal"). Plaintiff-appellee Island Insurance Co. ("Island" or "the surety") issued a "Subcontractor's Performance and Payment Bond" ("the bond") to insure Hawaiian's performance. Hawaiian was required by its contract with Oahu ("the subcontract") to obtain such a bond. The bond named Hawaiian as principal and Oahu as obligee and was for the amount of $2,698,787, the amount to be paid for work performed under the subcontract.
 
 
 3
 Hawaiian eventually defaulted on the subcontract, and Island paid various of Hawaiian's obligations. Island refused, however, to pay the subcontractor's tax debts. Instead, Island sought a judgment declaring that it is not liable under the bond for employment taxes owed to the United States and to Hawaii ("the governments"). The governments filed counterclaims demanding the unpaid taxes. With penalties and interest, these counter-claims amount to $426,039 by the United States and $133,259 by Hawaii. All the parties moved for partial summary judgment on the issue of the surety's liability.
 
 
 4
 The district court granted the surety's motion, finding that the governments were not intended beneficiaries of the bond and therefore the surety was not liable for the subcontractor's unpaid taxes.
 
 DISCUSSION
 The Appropriate Inquiry
 
 5
 As this case is before us on summary judgment, we review the judgment de novo. Branco v. UFCW-Northern California Employers Joint Pension Plan, 279 F.3d 1154, 1156 (9th Cir.2002). Here, the pivotal question is one of contract interpretation.
 
 
 6
 Federal courts look to state law to construe common law surety contracts. Mai Steel Serv., Inc. v. Blake Constr. Co., 981 F.2d 414, 420 (9th Cir.1992). In construing contractors' bonds, Hawaii law applies traditional principles of contract interpretation. See Van Dusen v. G.S. Shima Contracting, Inc., 4 Haw.App. 261, 664 P.2d 753, 754 (1983). Under those traditional contract principles, "the terms of a contract should be interpreted according to their plain, ordinary and accepted use in common speech, unless the contract indicates a different meaning." Pancakes of Hawaii, Inc. v. Pomare Properties Corp., 85 Hawai'i 300, 944 P.2d 97, 102 (App.1997) (internal citations and quotation marks omitted). Barring ambiguity, then, our focus should be on the contractual language.
 
 The Contracts' Language
 
 7
 Appellants make a simple and convincing argument from the texts of the subcontract and bond. The subcontract mentions taxes in two places. The first sentence of Article I states: "Subcontractor agrees to pay in full for all labor, materials, equipment, supplies, superintendence, insurance, taxes, and other items used in, upon, or for the work called for in this Agreement." (Emphasis added). Article XIV states:
 
 
 8
 "Subcontractor agrees to pay any and all taxes and contributions for unemployment insurance, old age retirement benefits and life pensions and annuities which may now or hereafter be imposed by the United States or any state or local government upon any wages, salary or remuneration paid to persons employed by subcontractor or otherwise, for the work required to be performed hereunder. Subcontractor shall comply with all Federal and State laws on such subjects, and all rules and regulations promulgated thereunder, and shall maintain suitable forms, books and records and save OAHU harmless from the payment of any and all such taxes and contributions, or penalties. Subcontractor agrees to pay any and all taxes, excises, assessments or other charges levied by any governmental authority on or because of the work to be done hereunder, on any equipment, supplies, materials, freight, or other matter used in the performance thereof." (Emphasis added).
 
 
 9
 It is apparent from these two passages that the subcontract required the subcontractor to pay its payroll taxes.
 
 The bond states:
 
 10
 "Now, therefore, if the said Principal [Hawaiian] shall duly and truly perform and complete said subcontract and pay for all materials used in the performance of same and shall hold the said Obligee [Oahu] free and harmless from and against all claims for any and all labor and materials used in the performance of said subcontract, which may or shall arise by reason of the failure of the said Principal to furnish, deliver and pay for any and all labor and materials in connection with the said subcontract, then this obligation shall be null and void; otherwise to remain in full force and effect." (Emphasis added).
 
 
 11
 The bond's language is archaic and awkward. As we read it, the bond lists three conditions in parallel, the breach of any of which will create an obligation on the part of the surety. The first of these conditions incorporates the entire subcontract: "Principal shall duly and truly perform and complete said subcontract."[1] So, taken together, the texts of the two contracts do designate the payment of federal and state taxes as one of the bond's conditions for discharge. The subcontractor was bound to pay its taxes, the surety insured the subcontractor's obligations under the subcontract, and so the surety is now bound to pay the taxes the subcontractor defaulted upon.
 
 
 12
 Once we accept that the surety was bound to cover the subcontractor's tax obligations, it follows that the federal and state governments are intended beneficiaries of the surety contract. Under the Restatement (Second) of the Law of Contracts[2] an individual or entity is an intended beneficiary of a contract if "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation to the promisee to pay money to the beneficiary or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." Restatement (Second) of Contracts § 302(1) (1979 Main Vol.).
 
 
 13
 Term (a) applies in this case. Island, the promisor, has promised to ensure the performance of the subcontract entered into by Hawaiian, the promisee. That subcontract includes a commitment to pay taxes. Island will therefore "satisfy an obligation to the promisee to pay money to the beneficiary" by paying Hawaiian's unpaid taxes. And because the governments are intended beneficiaries, "a direct action by beneficiary against promisor is normally appropriate to carry out the intention of promisor and promisee." Restatement (Second) of Contracts § 302 Comment b. On this view, the governments are in an analogous position to that of other creditors — those that supplied materials, for example — who would suffer from the subcontractor's default.[3]
 
 The Contracts' Purpose
 
 14
 One of Island's arguments to the contrary is based not on the text of the contracts but on assertions concerning the purpose of surety bonds. Island maintains that the bond's primary beneficiary is the contractor, and the contractor is not liable for the subcontractor's unpaid taxes, so the government cannot be a third-party beneficiary to the bond.
 
 
 15
 A Tenth Circuit case, United States Fidelity & Guaranty Co. v. United States, 201 F.2d 118, 120 (10th Cir.1952), did rely on similar reasoning, noting that an employer's duty to pay taxes is his alone, and concluding from that premise that the surety and bond did not confer that obligation. There are, however, certain circumstances under which a third party can be held liable for unpaid withholding taxes, see 26 U.S.C. § 3505(a) & (b) and Haw. Rev.Stat. § 235-61(a)(3)(B), although these statutory provisions apply only when the third party either pays wages directly or controls the payment of wages.
 
 
 16
 The taxes sought in this case, however, accumulated at a time when Hawaiian controlled its funds and payment of wages.
 
 
 17
 The premise that the contractor was not liable for the subcontractor's unpaid taxes in this case is quite correct. But to rely on the way that the facts actually played out, giving short shrift to the actual language of the pertinent agreements, is to view matters from the wrong vantage point.[4]
 
 
 18
 First, it is worth keeping clear that the bond agreement is between the subcontractor and the surety. The bond is required of the subcontractor by the subcontract, and is presumably designed to satisfy the principal contractor's interests. But these interests only inform the interpretation of the bond; it is the contractual language that ultimately controls. Whether or not there could have been any motive to designate the governments as intended beneficiaries is only relevant to the extent that it influences our contractual interpretation. That is to say, the complete absence of a motive might lead us to conclude that the contracts could not possibly mean what they seem to mean.
 
 
 19
 Second, the proper inquiry regarding potential tax liability should not have been whether the contractor could be held liable today, but rather whether, at the time of contracting, the possibility of unpaid taxes would have posed any threat to the contractor's interests. If so, it seems that the parties to the bond could have reasonably intended to insure against the subcontractor's potential future default, and there is no anomaly in reading the bond to have done so.
 
 
 20
 At the time of contracting, it could well appear to a principal contractor that the possibility that the subcontractor would not pay his payroll taxes would pose a threat to the contractor's interests. A risk-adverse primary contractor could hypothesize several circumstances in which a subcontractor's default on its tax obligations could wind up costing the primary contractor money.
 
 
 21
 For example, if the principal contractor were to assist the subcontractor in payment of wages at any point during the relationship, the contractor could be held liable under federal and state law for any unpaid taxes related to such wages. In United States v. Algernon Blair, 441 F.2d 1379 (5th Cir.1971), for example, a contractor made payroll advances to a financially strapped subcontractor and was held liable for withholding taxes under 26 U.S.C. § 3505(b). Viewed from the time of contracting, this is exactly the kind of occurrence that a cautious primary contractor would want to insure against in a surety bond.
 
 
 22
 Also, there is the possibility that tax authorities could seize either the assets of a defaulting subcontractor, precluding the subcontractor from completing the contract, or those assets of the primary contractor owed as payments to a defaulting subcontractor, impairing the ability of the primary contractor to complete the contract should the subcontractor fail to do so. The latter was the case in Wynne Co. v. Phillips Construction Co., 641 F.2d 205 (5th Cir.1981), which upheld an IRS levy on a contractor's assets for the progress payments owed to a sub-contractor. Progress payments are also part of the subcontract agreement in this case.
 
 
 23
 Again, a careful primary contractor, intent upon assuring against all species of default by a subcontractor that could cause it financial loss, would want a sub-contractor's bond to cover the subcontractor's tax liabilities in order to avoid these possible outcomes.[5]
 
 
 24
 Our conclusion that there could well have been such a motive is not a claim about what the parties were actually thinking. In fact, there is some evidence in the record that neither of the parties gave any thought at the time of contracting to whether the bond would cover the subcontractor's taxes. But such evidence is barred by Hawaii's parol evidence rule, based on the "well-settled principle that an agreement reduced to writing serves to integrate all prior agreements and negotiations concerning the transaction into the written instrument which then represents the final and complete agreement of the parties." State Farm Fire and Casualty Company v. Pacific Rent-All, Inc., 90 Hawai'i 315, 978 P.2d 753, 762 (1999). Accordingly, our ruling rests on the language of the contracts. The bond plainly incorporates the subcontract, which in turn covers the subcontractor's tax obligations. To ignore the express contractual language would be to endanger the reliability and clarity of surety contracts.
 
 
 25
 Island also argues that because tax obligations arise at law (that is, they are created by statute) rather than by contract, such obligations just recite preexisting legal duties. Two appellate court cases with facts similar to the one before us found this consideration relevant. See United States v. Maryland Casualty Co., 323 F.2d 473, 475 (5th Cir.1963), United States Fidelity & Guaranty Co. v. United States, 201 F.2d 118, 119 (10th Cir.1952).
 
 
 26
 As discussed, however, there are reasons why parties might want to contract to insure the fulfillment of the tax obligations that arise under law; the legal obligation thereby becomes a contractual obligation as well. None of the cases cited suggests that parties should be disallowed from insuring such an obligation. So the definitive question remains one of contractual intent — what were the parties trying to do — for which the contract itself is most relevant.
 
 Conflicting Precedents
 
 27
 Both parties cite cases, none of which is binding authority, which support their position. The governments rely largely on two appellate court cases. See United States v. Phoenix Indemnity Co., 231 F.2d 573 (4th Cir.1956) (holding sureties liable to the United States for tax obligations in a construction contract for which the sureties provided performance and payment bonds); Home Indemnity Co. v. F.H. Donovan Painting Co., 325 F.2d 870, 873-74 (8th Cir.1963) (holding surety liable for the tax obligations of a subcontractor where bond incorporated subcontract and subcontract specified tax obligations). These cases are indeed pertinent and persuasive, Island's attempts to distinguish them notwithstanding.
 
 
 28
 Island invokes several cases. See, e.g., United States v. Maryland Casualty Co., 323 F.2d 473 (5th Cir.1963), United States v. Seaboard Surety, 201 F.Supp. 630 (N.D.Tex.1961), United States Fidelity & Guaranty Co. v. United States, 201 F.2d 118 (10th Cir.1952), United States v. Crosland Construction Co., 217 F.2d 275 (4th Cir.1954), Oklahoma Tax Commission v. Seaboard Surety Company, 327 F.2d 709, 711 (10th Cir.1964), Westover v. William Simpson Constr. Co., 209 F.2d 908 (9th Cir.1954). The general thrust of these cases is in accordance with Island's position that the government is not an intended beneficiary with regard to surety bonds similar to the one in this case, and therefore the surety may not be held liable for the subcontractor's tax obligations.
 
 
 29
 Some of the cases Island cites barred possible recovery because of contractual language not present in the contracts before us. See, e.g., United States v. Crosland Construction Co., 217 F.2d 275 (4th Cir.1954) (bond specified that "the principal shall promptly make payment to all persons supplying labor and material," presumably without incorporating entire subcontract); United States v. Maryland Casualty Company, 323 F.2d 473, 476 (5th Cir.1963) (bond was specified to benefit "laborers, materialmen, and other creditors of the Principal whose indebtedness arises out of said contract," and court held that Government was "not a creditor in the usual sense"); Oklahoma Tax Commission v. Seaboard Surety Company, 327 F.2d 709, 711 (10th Cir.1964) (bond assured payment to "claimants," and a "claimant" was defined as "one having a direct contract with the Principal or with a subcontractor of the Principal who has furnished labor, material, or both"). Others of appellee's authorities involved bonds entered into under the Miller Act, which protects only suppliers of labor and material. See 40 U.S.C. § 270a(a)(2), Westover v. William Simpson Constr. Co., 209 F.2d 908 (9th Cir.1954), United States Fidelity & Guaranty Co. v. United States, 201 F.2d 118 (10th Cir.1952).[6] In any event, none of these authorities is binding upon us, and we are obliged to decide the case based on contract principles and the language the parties have chosen.
 
 CONCLUSION
 
 30
 Relying on the plain language of the contracts in question, we hold that the state and federal governments are designated as intended beneficiaries of the surety bond. Parties are free, of course, to create surety bonds that do not insure for tax liabilities. They need only embody their intentions in the language of their contracts.
 
 
 31
 REVERSED.
 
 
 
 Notes:
 
 
 [1]
 On our reading, the second condition is "pay for all materials used in the performance of same" and the third condition is "shall hold the said Obligee free and harmless from and against all claims for any and all labor and materials used in the performance of said subcontract, which may or shall arise by reason of the failure of the said Principal to furnish, deliver and pay for any and all labor and materials in connection with the said subcontract."
 
 
 [2]
 "[S]ince Hawaiian case law regarding contract interpretation is sparse, we will have to assume that a Hawaii state court would apply general contract principles. This assumption is justified by reference to the Restatement of Contracts in several Hawaii casesIn re Taxes, Aiea Dairy, Ltd., 46 Haw. 292, 380 P.2d 156 (1963); Kaiser Hawaii Kai Development Co. v. Murray, 49 Haw. 214, 412 P.2d 925 (1966). We will look to the Restatement (Second) of Contracts as a primary source for the most recent statement of these general principles." United States v. Haas and Haynie Corp., 577 F.2d 568, 571 n. 1 (9th Cir.1978).
 
 
 [3]
 The dissent offers no reason why suppliers of materials and labor, whose claims are mentioned explicitly in the bond language, are not intended beneficiaries of the bond. Indeed, Islanddid pay such suppliers directly after Hawaiian defaulted. The dissent's only attempt to distinguish the governments from such suppliers is that it is more rare for a contractor to be liable for a subcontractor's unpaid taxes than it is for a contractor to be liable for a subcontractor's unpaid-for supplies. As we will elaborate further below, it is for the parties to assess their risks.
 
 
 [4]
 This is exactly the perspective adopted by the dissent. The dissent does not refute thepossibility that a contractor could be held liable for a subcontractor's unpaid taxes. The dissent only explains that Oahu did not turn out to be liable in this case. If judicial interpretation of contracts swayed with the wind of post-contract history, contracting parties would not know the legal meaning of their agreements at the time they enter them.
 
 
 [5]
 It is also worth noting that the idea that the bond insures tax liabilities comports with economic common sense. The bond was for the same amount — $2,698,787 — that was to be paid the subcontractor for its work. Presumably, the subcontractor would charge the contractor for its employment tax liabilities as for any other expense, so the $2.7 million likely included payment for tax liabilities. If the bond was not meant to insure tax liability, then one would imagine that the bond amount would be lower than the full subcontract amount
 The fact that the bond amount and subcontract amount are identical makes it difficult to accept the dissent's economic reasoning. The dissent invokes the golf course's potential claim for defects in Hawaiian's work, and argues that Oahu would have rather saved money for such claims than spend it on unpaid taxes. This of course assumes, improperly, that Oahu could have known beforehand that it would face such liability later on. Moreover, it seems improbable that the subcontract amount would include money for a job badly done. A subcontractor would normally calculate its charge to a contractor on the assumption that its work would be completed properly.
 
 
 [6]
 United States v. Seaboard Surety, 201 F.Supp. 630 (N.D.Tex.1961), a district court case, is not distinguishable in either of these ways. The Seaboard court considered and rejected the textual reasoning that we adopt here, and invoked the distinction between legal and contractual obligations that we discussed and rejected above. Id. at 635. Seaboard concluded that "the language of the instruments construed in the light of the purposes, reasonable intent of the parties, the cases and statute brings the court to the conclusion that the defendant Seaboard Surety Company did not [promise to pay subcontractor's unpaid taxes]." Id. at 636. Our approach abides more strictly by the contractual language.
 
 
 
 32
 O'SCANNLAIN, Circuit Judge, dissenting.
 
 
 33
 I respectfully dissent from the court's determination that the state and federal governments were intended beneficiaries of the surety bond insuring Hawaiian Foliage and Landscape's ("Hawaiian") performance. The purpose and language of the surety bond nowhere evinces an intent that Island Insurance Co. ("Island") be held liable for Hawaiian's unpaid taxes. Indeed, as I explain below, it would have made little sense for the parties to enter into the agreement described by the majority.
 
 
 34
 * I do not dispute the majority's recital of the facts or the relevant language of the bond and subcontract. I part company, however, with its conclusion that the surety bond, which is clearly meant to protect Oahu Construction Co. ("Oahu") from Hawaiian's failure to perform and nowhere mentions the state or federal government as beneficiaries, requires Island to pay Hawaiian's taxes.
 
 
 35
 The bond provides that Island is liable if Hawaiian fails: (1) to duly and truly perform and to complete the subcontract, (2) to pay for all materials used in performance of the subcontract, and (3) to hold Oahu harmless from all claims for any labor and materials used in the performance of the subcontract. Because, in a litany of other provisions, Article XIV of the subcontract mentions Hawaiian's responsibility to pay its own taxes, the majority divines that Hawaiian's failure to pay such taxes is a failure to "duly and truly perform and complete the subcontract" that triggers Island's obligation under the bond. Even more problematic, instead of being obligated to Oahu — the entity the surety bond was meant to protect — the majority holds that Island must directly reimburse the state and federal governments.
 
 
 36
 However, it is hornbook law that only if the governments are intended beneficiaries of the surety bond — not just incidental beneficiaries — is Island obligated to pay the taxes owed by Hawaiian. See Pancakes of Hawaii, Inc. v. Pomare Prop. Corp., 85 Hawai'i 300, 944 P.2d 97, 106 (App.1997) (stating the general rule that a third party does not have enforceable contract rights unless it is an intended beneficiary). The contracting parties must have intended directly to benefit the third party. Wright v. Associated Ins. Cos., 29 F.3d 1244, 1249 (7th Cir.1994).
 
 
 37
 As the majority recognizes, the governments may be intended beneficiaries of the bond if "recognition of a right to performance in [the governments] is appropriate to effectuate the intention of the parties and ... the performance of the promise will satisfy an obligation of [Island] to pay money to the beneficiary." Restatement (Second) of Contracts § 302(1)(a) (1979) [hereinafter "Restatement"]. The bond's reference to the subcontract, which includes a provision requiring Hawaiian to pay its own taxes, seems to satisfy the majority that Island bound itself to pay those taxes should Hawaiian fail to do so. I am not persuaded.
 
 
 38
 True, the surety bond references the subcontract, which, in turn, required Hawaiian to pay its own taxes. However, that fact alone does not make the governments intended beneficiaries of the bond. We presume that parties contract for themselves alone, see United States v. Seaboard Surety Co., 201 F.Supp. 630, 636 (N.D.Tex.1961), so a party claiming intended beneficiary status bears the burden of showing that the contracting parties intended to confer a direct benefit on it, United States v. Md. Cas. Co., 323 F.2d 473, 476 (5th Cir.1963). "An intent to benefit the third party must be apparent from the construction of the contract in light of all surrounding circumstances to qualify that party as a third party beneficiary." O'Connor v. R.F. Lafferty & Co., 965 F.2d 893, 901 (10th Cir.1992).
 
 II
 
 39
 The language of the bond indicates that the only identified and intended beneficiary of the bond is Oahu; it does not name the governments. The governments seize upon the fact that the bond and subcontract do not explicitly exclude them. However, to qualify as third party beneficiaries, the governments must show more than just that the original contracting parties did not consciously exclude them; rather, they must demonstrate that those parties intended to include them. Of course, the bond benefits entities to whom Oahu could be held liable in the event of a default by Hawaiian, such as those to whom Hawaiian might owe funds for materials and supplies, and for which Oahu, as the primary contractor, could be liable under state law. These suppliers are intended beneficiaries of the surety bond because they were clearly contemplated by the parties — the bond requires that Hawaiian "hold Oahu harmless from all claims for any labor and materials used in the performance of the subcontract." The governments are not so named.
 
 
 40
 Furthermore, the purpose of a performance bond is to guarantee to an obligee, such as Oahu, that its contract will be completed even if the subcontractor defaults. This generally involves the surety, here Island, agreeing to complete the construction or pay the obligee the reasonable costs of completing it. E.g., Aetna Cas. & Sur. Co. v. United States, 845 F.2d 971, 973-74 (Fed.Cir.1988). The primary and obvious reason to reference the subcontract in the bond is to establish the limits of and to aid in measuring Island's obligation to Oahu under the bond.[1] Indeed, virtually all of the provisions in the subcontract consist of obligations that Hawaiian undertakes for the benefit of Oahu: performance in a timely manner, obtaining insurance, providing qualified personnel, and indemnifying and defending Oahu against claims.
 
 
 41
 In construing contracts, we should adopt the interpretation that, under all circumstances, "ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects to be accomplished." Alliance Metals, Inc. v. Hinely Indus., 222 F.3d 895, 901 (11th Cir.2000) (quotations omitted); see also Am. Home Assurance v. Larkin Gen. Hosp., 593 So.2d 195, 197 (Fla.1992) ("To determine the intent of the parties, a court should consider the language in the contract, the subject matter of the contract, and the object and purpose of the contract."). The purpose of this bond was to ensure to Oahu that Hawaiian's portion of the project was completed, i.e., to protect Oahu from actual damages it could suffer if Hawaiian failed to perform.
 
 
 42
 Paying Hawaiian's taxes has nothing to do with completing the actual construction of the project, particularly considering that Oahu needs no protection from Hawaiian's tax liability since a general contractor is not liable for a subcontractor's failure to pay its taxes. United States Fid. & Guar. Co. v. United States, 201 F.2d 118, 120 (10th Cir.1952) (employer's duty to pay state and federal employment taxes "is a tax liability for which [it] alone is liable to the Government"). Hawaiian's liability for its unpaid taxes could not have been imposed on Oahu, an innocent third party, because that duty inhered solely in Hawaiian.[2] Thus, the bond, which was intended only to protect Oahu (who needed no protection from Hawaiian's tax liability), should not be read to protect the governments.[3]
 
 
 43
 The bond's purpose becomes even more evident when one considers the result of the majority's holding, which essentially ascribes to Oahu the intent to seek protection in a bond that harms, not guards, its interests. Allowing the governments to collect taxes from performance bonds reduces the amount of funds available to Oahu for completion of the project, payment to laborers, and payment of other damages that Oahu could incur as a result of Hawaiian's default. For example, the owner of the golf course indicated that it might file a claim for alleged defects in Hawaiian's work, involving almost $200,000 per hole of the golf course. The governments' tax claims, not including interest and penalties, total almost $600,000. The sum of the bond is $2,698,787, of which $297,303 has already been expended for claims. When one considers the amount of the golf course's potential claim, it becomes clear why Oahu would want the full amount of the bond available to cover claims against it. I cannot believe that the parties intended that this bond, which was meant to protect Oahu, would cover payments to taxing authorities, thereby reducing the bond's value to Oahu by over 20 percent.[4]
 
 
 44
 Both Oahu and Hawaiian admit that they had no intention for the bond to cover Hawaiian's tax obligations. See McCarthy v. Azure, 22 F.3d 351, 362 (1st Cir.1999) ("As is generally the case in matters of contract interpretation, `[t]he crux in third-party beneficiary analysis ... is the intent of the parties.'") (quoting Mowbray v. Moseley, Hallgarten, Estabrook & Weeden, 795 F.2d 1111, 1117 (1st Cir.1986)). Indeed, as discussed above, it would make little sense for a general contractor like Oahu to seek such an arrangement. Neither the language nor the purpose of the bond lead me to conclude that the governments were intended beneficiaries of it.
 
 III
 
 45
 The majority lists two instances in which a general contractor like Oahu might be affected if its subcontractor did not pay its taxes, supra at 1166. However, the fact that Oahu may have self-protective reasons for requiring Hawaiian to pay its taxes does not establish that the governments are intended beneficiaries of Oahu's subcontract and bond. Rather, as Island argues, it demonstrates that the subcontract's tax provisions are for the primary benefit of the general contractor and only incidentally for the benefit of any taxing authority. See Seaboard Surety Co., 201 F.Supp. at 635 (holding that a provision requiring subcontractor to pay taxes did not evidence an intent to benefit the United States, but showed instead that the general contractor was primarily concerned with its own position). One should remember that incidental beneficiaries have no legal right to enforce a contract. Eastman v. McGowan, 86 Hawai'i 21, 946 P.2d 1317, 1324 (1997). If Hawaiian's failure to pay its taxes did affect Oahu in the form imagined by the majority, the bond would mitigate Oahu's actual loss stemming from Hawaiian's failure.[5] It is quite a leap for the majority to conclude that by contracting to protect itself from Hawaiian's failure to pay its taxes, Oahu also contracted to cover losses sustained by the taxing authorities.
 
 
 46
 As the majority correctly recognizes, I am not refuting the possibility that a contractor, in some rare cases, could be held liable for a subcontractor's unpaid taxes, supra at 1165 n. 4. My point is simply that the parties provided for that possibility not by payment to the taxing authorities of the entire amount owed by Hawaiian, but rather by payment of the amount that would actually be owed by Oahu. That is why the subcontract requires Hawaiian to "save Oahu harmless from the payment of any and all" taxes. The parties' intent extended no further.
 
 
 47
 Finally, as the district court noted, despite the subcontract's provision that Hawaiian pay its taxes, its duty to do so arose not from its contractual relationship with Oahu, but rather by virtue of law. See Central Bank v. United States, 345 U.S. 639, 645-46, 73 S.Ct. 917, 97 L.Ed. 1312 (1953). The provision in the subcontract did not create Hawaiian's tax obligation, but was merely declaratory of its existing legal duty. Md. Cas., 323 F.2d at 475; United States Fid., 201 F.2d at 119. Thus, because the duty arose not under the subcontract, but by operation of law, the fact that the bond incorporates the duties imposed by the subcontract is immaterial.
 
 IV
 
 48
 Even conceding that the majority's reading of the surety bond's reference to the subcontract could be plausible, "[w]here the language of a contract `is susceptible of two constructions, one of which makes it fair, customary and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not likely enter into, the interpretation which makes a fair, rational and probable contract must be preferred.'" Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 839 P.2d 10, 25 (1992) (quoting Mgmt. Sys. Assoc. v. McDonnell Douglas Corp., 762 F.2d 1161, 1172 (4th Cir.1985)). Here, the majority's interpretation is inequitable and unusual, and it certainly does not describe a contract into which reasonable men and women would likely enter.
 
 
 49
 I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 Thus, I read the bond's condition that Hawaiian "perform and complete" the subcontract as referring to Island's obligation to complete or pay for completion of Hawaiian's work under the subcontract in the event of a default. This does not mean completing each and every recital in the subcontract for the benefit of persons other than Oahu
 It is hard to divine a limiting principle in the majority's approach to third-party beneficiary status. Consider, for example, that the subcontract also requires Hawaiian to "maintain a qualified and skilled Superintendent or Foreman at the site." Article XXI. If Hawaiian fails to do so, is the individual who might have been employed in that position an intended beneficiary of the bond? Just as requiring payment of taxes, the subcontract required Hawaiian to hire a skilled Superintendent to monitor the worksite; Hawaiian's failure to do so would be a breach of the subcontract, which, in turn, is incorporated by the bond. Would not Island be required to pay lost wages to the person who should have been Superintendent under the majority's theory?
 
 
 [2]
 Neither 26 U.S.C. §§ 3505(a), (b) or Haw. Rev.Stat. § 235-61(a)(3)(B), which provide narrow circumstances in which third parties may be held liable for unpaid taxes, apply to this situation because Hawaiian's unpaid taxes accrued when it had control over its payment of wages. Nor was Oahu paying those wages or supplying funds for the specific purpose of paying the employees' wages
 
 
 [3]
 The United States and Hawaii already have a full arsenal of statutory powers to collect taxes from Hawaiian (e.g., liens and seizures). They do not need the additional firepower that the majority gives them today
 
 
 [4]
 The majority takes issue with my "economic reasoning,"supra at 1166 n. 5, but reads too much into the fact that the amounts of the bond and subcontract are equal. Certainly a subcontractor "normally calculates its charge to the contractor on the assumption that its work would be completed properly," supra at 1166 n. 5; however, the very purpose of a surety bond is to protect a general contractor in case the work is done improperly or incompletely. Usually when that happens, the cost of repairing the unacceptable work, or hiring someone else on short notice to complete the project, is more than the original contract price. Or, as demonstrated by this case, Hawaiian surely did not budget into its subcontract price the possibility that it would owe fines and interest on unpaid taxes.
 
 
 [5]
 For example, under the majority's hypothetical, if Oahu assisted Hawaiian with the payment of wages, thus potentially making itself liable for unpaid withholding taxes under state and federal law,supra at 1166, Oahu's remedy would be to seek the bond's coverage for the actual amount it might have owed the taxing authorities.